140 N.J. Super. 35 (1976)
354 A.2d 717
IN THE MATTER OF THE ESTATE OF HAROLD E. GRISWOLD, DECEASED.
Superior Court of New Jersey, Morris County Court, Probate Division.
January 30, 1976.
*37 Mr. Garth F. Weber for plaintiff American National Bank and Trust (Messrs. Jeffers and Dillon, attorneys).
Mr. Alfred L. Ferguson for defendants Sarah Griswold Leahy, Mary Griswold Flender, Susanna Whitney Griswold and Alfred Whitney Griswold, Jr. (Messrs. McCarter and English, attorneys).
Mr. William J. Brennan, III, for defendant Martin T. Dyke (Messrs. Smith, Stratton, Wise & Heher, attorneys).
LONG, J.S.C.
This case raises, but in a different setting, the same general question as was raised in In re Comly, 90 N.J. Super. 498 (Cty. Ct. 1966), that is, whether an adopted adult is a child of the adopting parent within the meaning of a will of a third person, a "stranger to the adoption," which provides that upon the death of the life tenant *38 (the adopting parent) the remainder shall be paid to his children or issue of deceased children.
Testator Harold E. Griswold died on July 8, 1952 a resident of Morris County, leaving a will which was executed on October 20, 1950. The will was admitted to probate by the Morris County Surrogate on July 21, 1952. Testator was survived by two sons, Alfred Whitney Griswold and Harold Ely Griswold, Jr. (who was known as "Ely" and will be so designated herein to distinguish him from his father). The will divided the residue equally between two trusts, one for the benefit of son Alfred for his lifetime and one for the benefit of Ely for his lifetime. The remainders of each trust were left to "such children or issue of deceased children of my said son as shall then be living, per stirpes." Each trust provided for gifts over in the event of death of the life tenant without leaving a child or issue of a deceased child.
Alfred died in 1963 leaving his wife Mary and their four natural children.
At the time of the execution of the will Ely was married but having marital difficulties, and this was known to his father. He obtained a divorce in February 1951. There were no children of that marriage. In 1946 or 1947 Ely had begun a relationship with Adrienne Moore. From 1947 on they had been living together or in adjoining apartments, until 1955 or 1956 when they were married. His wife had been previously married and had a son, Martin Trester Dyke, 3rd, who was born on August 7, 1924. He was about 31 years of age at the time of his mother's marriage to Ely. Ely was living in California during this period.
In 1963, at the suggestion of a California attorney, Ely began to consider the advisability of adopting his wife's son, Martin Dyke. Dyke was married, had three children and was living with his family in Tennessee or elsewhere in the Eastern or Southeastern United States. He had left California in 1949.
*39 Ely decided to go ahead with the adoption. Dyke consented thereto and proceedings were instituted in California. Subsequently a judgment of adoption was entered in Superior Court, Orange County, on October 18, 1965. At the time of the adoption Dyke was 41 years old and Ely was 56. Ely was born September 8, 1909 and was thus one month shy of the 15-year age differential which is required under the New Jersey statute.
Ely's wife, Adrienne Moore Griswold, died on January 22, 1973. There were no children of that marriage. Ely died on December 22, 1973, leaving no spouse or natural children or issue, but survived by Martin Dyke, his adopted son.
Upon the death of Ely the surviving trustee of his trust filed its fourth and final account and in connection therewith sought instructions as to the final distribution of the principal and accumulated income of the trust. Claims thereto are made by the four surviving children of Alfred Whitney Griswold and by Martin Trester Dyke, 3rd, the adopted stepson.
The primary objective is to ascertain the probable intention of the testator. Where such intention can be determined from the language of the will or from the attending circumstances, that intention should be given effect. Fidelity Union Trust Co. v. Robert, 36 N.J. 561 (1962); Bank of New York v. Black, 26 N.J. 276 (1958); In re Coe, 42 N.J. 485 (1964); In re Estate of Burke, 48 N.J. 50 (1966); In re Thompson, 53 N.J. 276 (1969); Wilson v. Flowers, 58 N.J. 250 (1971).
In this case there is nothing in the will itself nor in the surrounding circumstances to establish that the subject of adult adoptees as "children" of testator's sons was discussed by testator with his counsel or specifically considered by them. The search for probable intent must therefore be based upon a consideration of the language of the will, all of the relevant facts and circumstances in respect to the testator, *40 and the application and effect of In re Coe, supra, and of N.J.S.A. 2A:22-3.
The adopted child, Martin Trester Dyke, 3rd, argues that he is entitled to take under this will under the holding of In re Coe, supra, and upon a correct construction of N.J.S.A. 2A:22-3 and the history of that statute. The four surviving children of Alfred Whitney Griswold, who would take the remainder unless Mr. Dyke takes, contend that testator's probable intention would be to exclude the adopted adult; that the adult adoption statute differs in significant respects, and historically, from the minor adoption statute (now N.J.S.A. 9:3-17 et seq.), and should not be construed to mean that an adopted adult qualifies as a child of the adopting parent under the will of a stranger to the adoption; that the law existing at the time of the execution of the will should govern the case, and finally, that the adoption of Dyke was for the purpose of defeating a testamentary disposition and is a fraud as a matter of law.
The trustee takes a nonadversary position but made an extensive presentation with respect to the law applicable to the case, discussed the problems of fiduciaries in connection with questions regarding adult adoptees, and requested that the court make a determination applicable to all cases of adult adoptees, either that they take as children or issue under a third person's will or they do not.
This court concludes as follows:
(1) The law of New Jersey governs the case;
(2) The language of the will, together with the attending circumstances, require a conclusion that testator's probable intention would be to exclude the adopted adult as a child of testator's son Ely;
(3) The Coe case is not fully applicable to the situation of the adult adoptee and does not indicate or require a finding that there is a presumption that the adult adoptee would take as a "child" of the adopting parent under this testator's will;
*41 (4) N.J.S.A. 2A:22-3 should not be construed to constitute the adopted adult a child of the testator's son Ely under this will and
(5) In any event, this adoption is an abuse of the adoption process and of testator's will and, in that sense, a "fraud" within the meaning of In re Coe.
It is recognized that these subjects become intermingled and to some extent overlap each other, but it may be helpful to discuss them separately. That is, probable intent is a concept dealing with the testator's state of mind but the determination of it must sometimes rest on the existence or nonexistence of a presumption, either statutory or otherwise, and the ultimate determination may depend upon whether there is a presumption and, if so, what the presumption is and whether the surrounding circumstances are such as to indicate a contrary intent and overcome the presumption.

I

THE LAW OF NEW JERSEY IS APPLICABLE
The trust here in question has a situs in New Jersey. The adoption took place in California. Assuming that the adoption in California was valid under the laws of that state, it is entitled to recognition in the State of New Jersey, but the legal incidents and effects of that status with respect to property in New Jersey are to be determined by the laws of this State. Dulfon v. Keasbey, 111 N.J. Eq. 223 (Ch. 1932); Zanzonico v. Neeld, 17 N.J. 490 (1955). In Zanzonico the court said:
* * * However, we have rejected the provincial approach and, in accord with traditional concepts of comity and in the exercise of due regard for the welfare of the adopted child, have accorded recognition to foreign adoption decrees for inheritance purposes, subject only to two conditions which pertain generally to the recognition of any foreign judgment: (1) that the foreign court had jurisdiction to fix the status of the child with respect to the adoptive parents, and (2) that the recognition of the foreign decree *42 will not offend the public policy of our own State. In re Finkenzeller's Estate, supra, [105 N.J. Eq. 44] at page 46. * * *" [at 495]
The adoption here offends New Jersey policy in regard to the required age differential of 15 years, but the deficiency is slight, the offense to policy is minimal, more important questions of policy are involved in the case, and the decision here should not turn on that issue.

II

THE PROBABLE INTENT OF TESTATOR
There being nothing in the language of the will which by itself reveals a clear intent to either include or exclude an adult adoptee, and nothing to indicate that the subject was either discussed or considered, it is probable that the subject was not thought about and that there was therefore no specific intent of either the testator or the draftsman of the will, an experienced and competent attorney. The attorney's files were examined.
However, there are some elements of the will which give some indication of what the probable intention would have been if the matter had been thought about. To begin with, the ordinary meaning of the word "child" is a natural child. To equate a 41-year-old man, not related by blood, to a natural born grandchild is a strain and a legal fiction. In this will testator made a clear, striking and definite distinction between his two sons. It is clear that the difference was based upon a difference in their positions, accomplishments, life style and responsibility. One had advanced as a prominent and respected figure in the educational world. His wife and children were regarded with affection by testator. The other had no such record or prospects and had a wife who was apparently a source of pain and concern to both testator and son Ely; he had no children.
*43 The pattern of the will is clearly to provide income for testator's two sons during their respective lifetimes and then primarily to the children of each son or the issue of any child of such son who may have died prior to the death of his father. At the time of the will son Alfred had a wife living and natural children. Ely had a wife with whom he was having marital difficulties and had no children. The trust for Alfred provided that upon his death the corpus and income of the trust should be paid to such of his children or issue of deceased children as should then be living, per stirpes. It further provided that if, upon the death of Alfred, there should not be living any child, or issue of a deceased child, of Alfred then the remainder should be paid to Alfred's wife Mary. Upon the failure of all of those gifts the remainder was to be paid to "Harold Ely Griswold, Jr."
The trust for Ely had some significant differences. Upon the failure of children of Ely or of issue of a deceased child of Ely, there was no provision for any wife Ely might then or thereafter have. Accordingly, the gift over was that if, upon the death of Ely, there should not be living any child, or issue of deceased child, of Ely, then the remainder was to be paid to "my son, Alfred Whitney Griswold or if he shall not then be living to his then living issue, per stirpes."
In addition, the trust for Ely was in the nature of a spendthrift trust and directed the trustees to pay over to him "so much of the net income then remaining as my trustees, in their sole, absolute and uncontrolled discretion, shall see fit to give him, it being my intention in setting up this discretionary trust to restrain voluntary alienation of the income and principal thereof by my said son, Harold Ely Griswold, Jr., and to exempt his interest thereunder from the claims of his creditors." It was also provided that if Ely should become ill and the income be insufficient to provide for his proper medical and hospital care, the trustees were authorized to use and apply so much of the principal *44 of the trust from time to time as they in their discretion deem necessary for such purpose.
In the event of the death of the individual trustee, Edward K. Mills, Jr., the will named Alfred as substituted executor or trustee in his place. Ely was not so named as a substitute trustee, either of Alfred's trust or his own.
The pattern with respect to Ely's trust was to pay him so much of the income as the trustees saw fit to give him, to use principal if necessary, but to protect his interest in the trust from the claims of his estranged wife and other creditors and "to restrain voluntary alienation of the income and principal thereof by my said son." The purpose was to prevent disposition of the principal by Ely in his lifetime.
The will demonstrates an intention of testator to dispose of his entire estate. He did not leave the choice of remaindermen to the life beneficiaries but specified them. The class specified was "children or issue of deceased children" and the gift over in Ely's trust to testator's grandchildren was to take effect if "there shall not be living any child or issue of deceased child" of son Ely. It appears probable that testator's intent was that child or issue meant related to the family by blood and not otherwise.
There are other circumstances which throw light on the testator's probable intent. He had made a previous will on May 14, 1946. That will left the remainder of the estate in two equal parts, Part A to be paid outright to son Alfred and Part B in trust for son Ely during his lifetime, with the remainder to Harold "children or issue of deceased children" and, if none, to son Alfred if alive or to son Alfred's then living issue. This will also provided a power of appointment with respect to Alfred's half, to be exercised by Alfred's will and operative in the event Alfred predeceased testator. There was no such power of appointment provided with respect to Ely's trust. This indicates not only that testator was aware of and made use of the device of a power of appointment but also that he was unwilling *45 to allow Ely to control the disposition of the assets of his trust.
Testator also executed a will on June 29, 1948. This will divided the remainder into two equal trusts, one for the benefit of Alfred for his lifetime and one for the benefit of Harold for his. It appears that the reason for changing the provision for Alfred from an outright gift, with a power of appointment, to a trust with remainder to his children was for tax reasons; he anticipated a substantial inheritance from another family source. The remainder of each trust was left to the children or issue of deceased children of the life beneficiaries. In Alfred's trust, in default of his leaving any child or issue of a deceased child the remainder was given to Alfred's wife, Mary Brooks Griswold, or if she should not then be living, to Harold. The trust for Ely was in similar terms but provided that upon the death of Ely without leaving any child or issue of a deceased child, then the remainder should be paid to Alfred, or if he should not then be living, to his then living issue, per stirpes.
On October 26, 1950, six days after executing the will here in question, the testator wrote a birthday letter to his son Alfred. It stated in part:
I am proud of you and I am sure of your future, in fact I feel that I have had a part in continuing the ideals of our ancestors and their steadfast integrity (of which there is little enough these days.)
The letter, of course, is not of great significance but it is some evidence of testator's strong pride in family and ancestral lineage, which, it appears, dates back in this country to 1629. The will also provided a bequest of $20,000 to son Alfred but made no such provision for Ely. This probably represented an equalization for the financial assistance which testator had given to Ely in resolving Ely's medical and marital problems.
At the time of the execution of the will on October 20, 1950 testator was aware that (1) Ely was 41 years old, (2) *46 he had no children, (3) his wife was not living with him and had obtained a support order against him in 1948, (4) he, the testator, had received communications from Ely's wife in regard to $2300, plus interest, alleged to be due her under a 1948 California court order, (5) the will made a gift over in the event Ely died without children or issue, (6) Ely was in straitened financial circumstances, and (7) Edward K. Mills, Jr., his counsel on September 29, 1950, had suggested the possibility of setting up a discretionary trust and also the possibility of leaving the entire residue to Alfred and "if Ely should thereafter remarry and have children it would seem only right that upon Ely's death Whit should give Ely's children their share of the equivalent of one-half of your residuary estate as you have indicated to be your wish under your present Will." (Emphasis supplied)
The revised will was executed less than a month later, on October 20, 1950. It did include a spendthrift trust. In March 1951 a property settlement was agreed upon with Ely's wife; testator paid $5500 to the wife and attorneys in connection therewith and Ely obtained a divorce. Despite the settlement of Ely's marital difficulties, his father never executed a later will.
Here, then, was a testator in 1950 who was proud of his ancestors, proud of one son and of his achievements and character and responsibility, sympathetic with the other son in his problems and difficulties and willing to help him resolve them, who maintained strict equality between the branches of the family, if Ely should have a branch, but whose share would revert to Alfred's branch if Ely did not leave a child or issue; a testator who once specifically failed to provide a power of appointment for Ely when he had done so for Alfred's share, and never thereafter provided one; a testator who consistently limited Ely's share to a trust and finally provided a spendthrift trust expressly barring the voluntary alienation of the income and principal thereof. *47 He never entrusted to him the right or responsibility of disposing of the remainder of his trust.
The test here is probable intent. That means at the time of execution of the will. In ascertaining this, the courts will give primary emphasis to testator's dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding facts and circumstances. The court's endeavor is to put itself in testator's position in so far as possible in the effort to accomplish what he would have done had he "envisioned the present inquiry." Fidelity Union Trust Co. v. Robert, In re estate of Burke, Bank of New York v. Black, all supra.
There was at the time no reason for testator or his counsel to think about the possibility of either of his sons adopting an adult. It appeared to be settled law and accepted at the time that even an adopted child would not take in these circumstances unless a contrary intent was stated. In re Fisler, 133 N.J. Eq. 421 (E. & A. 1943). The idea that a subsequently adopted adult could take would hardly have been entertained. Lawyers experienced in estate matters and the drafting of wills had nothing to alert them about any problem in that regard. (Clapp, Wills and Administration) 5 N.J. Practice § 124 (1950), says nothing about it although there is some discussion of the then state of the law in child adoption cases.
It may be that this testator would not have drawn a distinction between a natural child and an adopted child who was taken into Ely's home as a child and became a part of his household and family. In re Coe says that should be presumed unless testator explicitly reveals a contrary purpose. However, in view of the matters above discussed it seems to me clear what testator's view would have been if he had envisioned the present inquiry. The suggestion of diverting the remainder, which would otherwise pass to the Griswold family, by adopting an adult, he would have strongly disapproved. Diverting the trust by adopting a man 41 years *48 old (even though a stepson-in-law) living thousands of miles away with three children of his own, who might some day succeed to the Griswold inheritance, he would have disapproved even more strongly.
Under this will and the attending circumstances it is concluded that the probable intent here would not have been to so extend his bounty as to include the adopted adult as child or issue of Harold Ely Griswold, Jr.

III

APPLICABILITY AND EFFECT OF IN RE COE
In In re Comly, supra, the court held that the adult adoptee did not take and that In re Coe did not require a finding to the contrary. The will and factual situation in Comly were quite different from those in this case and it is deemed advisable to consider the Coe case and its application to this case in detail.
Prior to In re Coe, in determining the construction of the will of a stranger to the adoption and the testator's intent, the courts dealt with two subjects, among others:
(1) Whether the case fell within the limitation to the then child adoption statute, R.S. 9:3-9 and (2) whether that statute had any effect on a case where the will being construed is not that of the adopting parent but that of someone else, a stranger to the adoption. That is, the statute, originally L. 1877 c. 53, which after some amendments became R.S. 9:3-1 et seq., provided in R.S. 9:3-9 as follows:
Upon the entry of a decree of adoption * * * the child shall be invested with every legal right, privilege, obligation and relation in respect to education, maintenance and the rights of inheritance to real estate, or the distribution of personal estate, on the death of such adopting parent or parents, as if born to them in lawful wedlock; subject, however, to the limitations and restrictions hereinafter in this section set forth.
The adopted child shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent or parents, nor property coming from the collateral kindred of such adopting parent or parents by right of representation. * * *
*49 The courts dealt with a number of cases involving the question of whether, under a will of someone other than the adopting parent, making a gift to the "children," "heirs" or "issue" of a person, the adopted child of such person would take.
Eventually, in In re Fisler, 133 N.J. Eq. 421 (1943), the Court of Errors and Appeals appeared to stress the point that "issue" prima facie signifies "heirs of the body" and that a gift to "lawful issue" of an adopting parent fell within the limitation in the statute in regard to "property expressly limited to the heirs of the body of the adopting parent or parents." In addition to stressing that point, however, the court also said the decision in the court below, 131 N.J. Eq. 310 (Prerog. Ct. 1942), which also discussed the stranger to the adoption theory, was "well reasoned and altogether sufficient."
Fifteen years later, in In re Wehrhane, 23 N.J. 205 (1957), a majority of the Supreme Court said:
* * * All parties are in accord respecting the decisional law of our State that a provision for a "child", "children" or "issue" of another is presumed not to include an adopted child or children. See, e.g., In re Fisler, 131 N.J. Eq. 310 (Prerog. 1942), affirmed 133 N.J. Eq. 421 (E. & A. 1943); Fidelity Union Trust Co. v. Potter, 8 N.J. Super. 533 (Ch. Div. 1950). The rule has general acceptance. 5 American Law of Property (1952), secs. 22.34, 22.36. The same authorities invariably recognize that the presumption may be sufficiently contradicted in the total context of the instrument or the circumstances surrounding and existent at its execution or the death of the testator. * * * [at 208]
In 1964 in Coe the court considered the question of whether two children adopted by the life tenant of a trust created by the will of Mrs. Coe qualified to take a bequest given upon the death of the life tenant to her "lawful children." The will was dated September 1, 1897. Testatrix died September 8, 1897. The life tenant was an infant when she came to decedent, lived with her "nearly all her life," was ten years old at decedent's death and had become "as a daughter" for whom decedent felt the affection of a *50 mother. The life tenant, Theodora, was never adopted by decedent but was adopted by decedent's husband about one year and four months after decedent's death; she married in September 1907 and thereafter adopted two children. She had no natural children and upon her death in 1960 was survived by the two adopted children.
The court discussed previous cases and the child adoption statute; it disapproved the stranger to the adoption approach of Wehrhane and said that the Wehrhane court had itself rejected the theme of In re Fisler.
In Coe the court said:
* * * We are unable to accept Wehrhane's view of the adoption statute of 1877. We think the statute goes beyond merely prescribing a right of inheritance between the adopting parent and the adopted child. It expressly provides for cross-inheritance between natural and adopted children of the adopting parent. Further, the second paragraph of the statute, quoted above, by providing that an adopted child may not take by representation property coming from collateral kindred of the adopting parent, inferentially contemplates the child may so take from lineal kin. And the provision in the same paragraph of the statute that the adopted child shall not be capable of taking property "expressly limited to the heirs of the body of the adopting parent" plainly relates to the interpretation of some instrument and nothing in the statute limits it to the will or deed of the adopting parents.
At any rate, it is not important whether the adoption statute directly controls the interpretation of instruments. The important point is that the statute reflects the feeling and attitude of the average man and hence its policy should be followed unless the benefactor explicitly reveals a contrary purpose. * * * [42 N.J. at 489]
The court said also:
* * * True there was no legally recognized right to adopt at common law and hence the right as such depends upon statute as the authorities just cited point out, but our statute did not generate that familial or social phenomenon. Rather our statute belatedly recognized relationships which men have always assumed, and translated into a rule of law what the Legislature found to be their common expectation and wish.
Hence even if the quoted provisions of the adoption statute were thought to speak only of intestacy, they should nonetheless be *51 accepted as a reflection of a common expectation and wish and hence as a guide to proper interpretation of a gift: * * * [at 489-490]
Further the court said:
* * * We cannot believe it probable that strangers to the adoption would differentiate between the natural child and the adopted child of another. Rather we believe it more likely that they accept the relationships established by the parent whether the bond be natural or by adoption and seek to advance those relationships precisely as that parent would. None of us discriminates among children of a relative or friend upon a biological basis. See In re Patrick's Will, 259 Minn. 193, 106 N.W.2d 888, 890 (Sup. Ct. 1960); In re Trusteeship Agreement with Nash, 265 Minn. 412, 122 N.W.2d 104, 109 (Sup. Ct. 1963). We ought not impute to others instincts contrary to our own. Nor should we think we are different from our ancestors of 1877. As we have said, the adoption act of that year did not amend human nature; it yielded to it. * * * [at 492]
And again, in Chase Manhattan Bank v. Mitchell, 53 N.J. 415 (1969), the court said:
* * * There being no evidence of the testator's actual intention, we should follow the policy of the adoption law enacted in 1877, almost 50 years before the will here involved was executed. * * * [at 418]
These concepts and language are not necessarily applicable to an adult adoption. There is no indication that the Supreme Court meant that the feelings and attitudes of people toward adopted adults are the same as toward adopted children; it is doubted that it would so find. The adoption of children and the adoption of adults involve quite different considerations and different factors of policy and require and receive different treatment. The basic purpose of child adoption is to provide and protect the welfare of children, to provide homes and families and security for homeless children, and to provide children for couples who desire to have children to love and raise and maintain. A substantial factor here is the duty and obligation of support and maintenance.
*52 In an adult adoption the relation between the parties is different, the motivation can be quite varied, and such adoptions are treated differently in the statutes. Adoption of adults is ordinarily quite simple and almost in the nature of a civil contract. (California requires an agreement signed by the parties whereby, as in this case, they agree to assume toward each other the legal relationship of parent and child.) The complete severing of the relation to natural parents is not accomplished in an adult adoption; the relation remains in New Jersey as to inheritance in case of intestacy of the natural parents.
Interestingly, the distinctions between child adoptions and adult adoptions are well stated in a California case, Williams v. Ward, 15 Cal. App.3d 381, 93 Cal. Rptr. 107 (D. Ct. App. 1971), where the court said:
* * * There is a distinction which the testator, acting sometime prior to 1930, might well have had in mind if he ever thought of the subject of adult adoptions, a subject then unknown to the law of this state. It is that adopted minor children most likely would be closer to family traditions, history and affections than would adult adoptees, and might be expected to regard more gratefully and affectionately the deceased father of their adopting mother as an ancestor and benefactor.
Another distinction is that in adopting minors the daughter would become responsible for their support and education; wherefore, if she should die before these obligations had been fulfilled, the estate, which for some reason the testator did not wish to go completely to the daughter during her lifetime, would be useful for the benefit of the adopted children. When adults are adopted the usual duty of support (as distinguished from that which may arise from extraordinary circumstances) is not assumed by the adopter.
Another difference is this: adoption of minors (except in stepparent adoptions) can be effected only following investigation carried on by an agency of the State Department of Social Welfare (Civ. Code, § 226). But in the case of adult adoptions no such investigation is required (Civ. Code, § 227 p). One significance of this difference is that the purposes of the adopter may be inquired into when there is a proposed adoption of a minor. If the adoption of a minor is a second or later one, it can be ascertained that the subsequent adoption does not unduly diminish the right to support of earlier adoptees. Moreover, it can then be ascertained *53 that the motive of the adopter is not that of cutting down a remainder which has been left to children. When there is an adult adoption conducted without the investigation, there is opportunity for a life tenant, such as the daughter in this case, to reduce the remainder simply by adoption of willing adults. It is improbable that the testator intended such results. If he had wished to give his daughter power of appointment, he could have done so. * * * [at 110]
The case may be distinguished by the fact that at the date of testator's will adult adoption was not permitted in Cailfornia, but the above statement is nevertheless appropriate.
It is also of interest that the Supreme Court of Pennsylvania overturned its well-established rule that in cases involving testamentary gifts to a child or children of a person other than the testator-settlor, a child adopted after the will was executed or after the death of the testator was not entitled to take as a "child". The court adopted the doctrine of In re Coe, but expressly limited the rule to minor adoptees. In In re Estate of Tafel, 449 Pa. 442, 296 A.2d 797 (Pa. Sup. Ct. 1972), the court said:
* * * The rule of construction herein announced applies where the adoptee or adoptees at the time of adoption were minors and not adults and does not apply where an adoptee or adoptees was or were adults at the time of adoption. By the restriction of this rule of construction to minor adoptions we serve and effectuate the purpose of preventing an adult adoptee or adoptees from being considered a testamentary "child" or "children" where such adoption is undertaken by a person other than the testator to prevent a gift over in default of a natural `child' or `children' and thus, in effect, rewrite the testator's will. Cf. Holloway Estate, 444 Pa. 624, 281 A.2d 631 (1971). * * * [at 803]
The feature stressed in Coe is the common attitude and expectation with respect to an adoption. This would probably depend on the nature of the relationship and the ages and situations of the parties rather than on the name "parent and child" given to it by legal proceedings. The ordinary person may not feel much difference between a person *54 adopted at 17 years of age (a child) and one adopted at 19 (an adult), or treat the adoptees differently, but might have a very different attitude as between the adoption, for example, of a 10-year-old girl and that of a 35-year-old man.
These considerations are discussed in Halbach, "The Rights of Adopted Children Under Class Gifts," 50 Iowa L. Rev. 971, at 988 and 989.
See also, Wilson v. Johnson, 389 S.W.2d 634 (Ky. Ct. App. 1965), and also the dissenting opinion therein; also the cases collected in 21 A.L.R.3d 1012, "Adoption of Adult."
However, there is an additional problem. That is that Coe rested in part on the theory that the child adoption statute did govern more than the right of inheritance between the adopting parent and the adopted child. And the court said:
And the provision in the same paragraph of the statute that the adopted child shall not be capable of taking property "expressly limited to the heirs of the body of the adopting parent" plainly relates to the interpretation of some instrument and nothing in the statute limits it to the will or deed of the adopting parents. [42 N.J. at 489; emphasis supplied]
The fact is that the adult adoption statute, L. 1925, c. 99, which became R.S. 2:39-1 in the revision of 1937, had provisions similar in many respects to the child adoption statute of 1877 which the court discussed in Coe. The language was so similar that it might well be given the same effect. Nevertheless, it is considered that it should not be given the same effect.
It is strongly doubted that the Legislature actually intended the act of 1925 or the revision of 1937 to have that effect, or that such an intention can realistically be imputed. Up until Coe the courts indicated the child adoption statute did not have that effect under the will of someone other than the adopting parent, and that was the accepted view. *55 The adult statute would surely have been given the same interpretation. Coe reversed the interpretation because of the strong policy in favor of the equality of adopted children with natural children and perhaps of the "social desirability" of that result. There is no such strong policy in the case of an adult adoption, and the reason therefor not being present, the adult adoption statute should not have the same interpretation. In my view, such an interpretation of the adult statute could not be "accepted as a reflection of a common expectation and wish and hence as a guide to proper interpretation of a gift." So the matter stood as of 1950 when this testator died. The effect of the revision of the statute in 1952 will be discussed in point IV of this opinion. Consequently, despite the similarity of the language of the statutes, Coe should not control where the adoptee is an adult.
There is another policy ground for this, the invitation to fraud. In Coe the court said that the prospect of fraud was quite remote and could be dealt with upon equitable principles if the circumstances are truly compelling. The prospect is not so remote with respect to adult adoptions. Indeed, application of the rule of Coe to adult adoptions would in my view be an open invitation to the diversion of remainders, "treasure hunts" and even the sale of filiations to obtain the benefit of remainders in trusts established many years ago. Without safeguards ordinarily present in child adoptions, including the obligation of support, the risk is substantial and should not be taken. See, for example, Bedinger v. Graybill's Ex'r, 302 S.W.2d 594 (Ky. Ct. App. 1957), and Pennington v. Citizens Fidelity Bank and Trust Co., 390 S.W.2d 671 (Ky. Ct. App. 1965), where a 71-year-old life tenant of an estate under the will of her mother adopted her 74-year-old husband 37 years after the death of her mother. See also, in this State, In re Comly, supra, and in California, Williams v. Ward, supra.

*56 IV

THE EFFECT OF N.J.S.A. 2A:22-3
As stated, a second significant difference between this case and Coe is in the history of the adoption statutes. Our first adoption law was in reference to the adoption of minors and was enacted in 1877 (L. 1877, c. 83). The statute was carried into the Compiled Statutes of 1910, was amended from time to time and eventually appeared in the Revised Statutes of New Jersey (1937) as R.S. 9:3-1 to 16. At that time R.S. 9:3-9 provided as set forth in Point III above.
The provisions of this section remained substantially the same until a revision of the adoption law in 1953. L. 1953, c. 264. The new adoption law became N.J.S.A. 9:3-17 et seq. The former law, R.S. 9:3-1 to 16, was repealed.
In the 1953 revision the exception in R.S. 9:3-9 quoted above with respect to property expressly limited to the heirs of the body of the adopting parent was dropped and in lieu thereof it was provided as follows:
9:3-30B. The entry of a judgment of adoption shall establish the same relationships, rights, duties and obligations between the child and the adopting parent as if such child were born to such adopting parent in lawful wedlock. In applying the intestate laws of this State, an adopted child shall have the same rights of inheritance as if born to the adopting parent in lawful wedlock. In the construction of any testamentary or other document executed subsequent to the effective date of this act, an adopted child shall be deemed lawful issue of the adopting parent unless such document shall otherwise provide. [Emphasis supplied]
This provision, applying by its terms solely to wills executed after the effective date of the act (January 1, 1954) was noted in Coe but did not apply in that case and the court held that for the reasons stated in its opinion the adopted child would take, and without respect to the terms of that statute and its effective date.
*57 This amendment specifically provided for the construction of "any testamentary or other document" executed subsequent to January 1, 1954. It provided a rule of construction. It overturned prospectively the then-accepted thesis of In re Fisler that presumptively an adopted child did not take as a child or issue of the adopting parent under the will of another. No similar statute was then or thereafter enacted with respect to an adult adoption.
Moreover, the statute of 1953 abolished the existing right of inheritance of an adopted child from his natural parents "under the intestate laws of this State," further severing the relationship between the child and his natural parents. No similar provision was adopted with respect to an adult adoption and that right of inheritance still exists.
The 1953 statute also eliminated the portion of the prior law which expressly provided that the adopted child shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent, nor property coming from the collateral kindred of such adopting parent. No such action was taken with respect to the similar provision in the adult adoption statute and that provision still remains, in slightly different form.
As stated, the first statute authorizing the adoption of adults was enacted in 1925 (L. 1925, c. 99). It provided in § 5 in part as follows:
* * * the person so adopted shall be invested with every legal right, privilege, obligation in relation to the rights of inheritance to real estate, or to the distribution of personal estate on the death of such adopting parent or parents as if born to them in lawful wedlock; provided, said person so adopted shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent or parents, nor property coming from the collateral kindred of such adopting parent or parents by right of representation; * * *
This statute was carried into the revision of 1937 in substantially the same form. R.S. 2:39-7.
*58 It remained in the same form until the general revision of Title 2 of the Revised Statutes which became Title 2A, "Administration of Civil and Criminal Justice," adopted in 1951 to take effect January 1, 1952. This revision provided in part as follows:
2A:22-3 c. All rights, privileges and obligations due from the parents by adoption to the person adopted and from the person adopted to them and all relations between such person and them shall be the same as if the person adopted had been born to them in lawful wedlock, including the right to take and inherit intestate personal and real property from and through each other. Except, however, that:
a. The person adopted shall not be capable of taking property expressly limited by a will or any other instrument to the heirs of the body of the adopting parent or parents, nor property coming on intestacy from the collateral kindred of the adopting parent or parents by right of representation; * * *. [Emphasis supplied]
The revision of 1951 combined the provisions of R.S. 2:39-5 (contents of decree) and 2:39-7 (effect of decree) into one section, N.J.S.A. 2A:22-3. The portions in italics were new. It is not clear how or why they crept into the revision. In any event the first portion clearly dealt with intestate personal and real property. It appears to be even more specifically restrictive than the previous language of paragraph (d) of R.S. 2:39-7 and would appear to have no relation to the construction of the will of a person not a party to the adoption.
The second portion in italics "by a will or any other instrument" added nothing to the statute. The adult adoption statute already said "expressly limited." Those words already plainly related to the interpretation of some instrument (as said in Coe, 42 N.J. at 489) and the added words simply made clear what was meant. There was no indication therein of an intention to effect a drastic revision of the statute and govern other than matters of intestacy. If the Legislature had intended to do so by this revision it would have said so in clear and definite terms, as it did with the change in the child adoption act in 1953.
*59 The fact is that in 1951 there was no doubt as to what the intention was or what the construction of the statute would have been. See In re Fisler, supra. See, also, the opinion of the Prerogative Court in that case, 131 N.J. Eq. 310, where the court stated that § 4 of the child adoption statute prima facie concerns only the adopting parent and the adopted child, and dealt at some length with the stranger to the adoption theory and appeared to apply it. The Court of Errors and Appeals, in affirming the opinion below, said it was "well-reasoned and altogether sufficient" and also spoke in terms of the intention of a testator who was a stranger to the adoption (at 423 of 133 N.J. Eq.) See also, In re Wehrhane, 23 N.J. 205 (1957), and the concurring opinion of Justice Jacobs in that case. It is also noted that in In re Thompson, supra, Chief Justice Weintraub said (at 297 of 53 N.J.), "In any event it is fair to assume that had the present controversy been adjudged at any time between Fisler and Wehrhane, the adopted child would have lost." The case cited all dealt with the adoption of minors, but surely the view stated would have been even more strongly held in the case of adoption of an adult. See also to the same effect: 5 N.J. Practice (Clapp, Wills and Administration) § 124 (1950); Silberman, 1 Rutgers L. Rev. 282.
Consequently, it is most improbable that in 1951 the adult adoption statute, as altered by the revision of Title 2, was intended or would have been construed to establish a presumption that an adopted child would take as a "child" of the adopting parent under the will of a stranger to the adoption. It is noted that in 8 Rutgers L. Rev. at page 26, in reviewing the 1953 legislative year, Dean (later Judge) Clapp commented on the 1953 statute revising the law of child adoptions and said:
* * * More important than any of these provisions is that affecting the construction of a will or other document executed subsequent to the effective date of the act, namely, the provision that "an adopted child shall be deemed lawful issue of the adopting parent unless such document shall otherwise provide". The act becomes *60 effective January 1, 1954. The provisions of the adult adoption law, dealing with the effect of an adoption of an adult upon the inheritance of property and upon the taking of property under a will, should be amended to conform with the new act. * * *
Aside from the expressed opinion that the adult adoption law should be amended to conform with the changed child adoption law, which is debatable, this supports the view that N.J.S.A. 2A:22-3 did not change the law as to adult adoptions. It is also noted that despite the invitation, the Legislature has not yet seen fit to amend the adult adoption statute. It cannot be fairly assumed that the failure to act is due to In re Coe. It is concluded that the revision of 1951 was intended to clarify existing law, not to change it, and that the presumption against an adult adoptee still remains.
In any event, even if it should be determined that the alteration of the language accomplished by the revision of Title 2 in 1951 would establish a presumption in favor of an adopted adult, the statute should not apply retroactively. Such interpretation would overturn settled and accepted law, and there are not the strong policy factors regarding adult adoptions which were found to be applicable to adoptions of children. Such interpretation should not therefore apply to a will executed in 1950.

V

WHETHER THIS ADOPTION CONSTITUTES AN ABUSE OF THE WILL AND FRAUD
Even if it be assumed that by reason of Coe or the adult adoption statute it should be presumed that the adult adoptee should take as a "child or issue of deceased child" of Harold Ely Griswold, Jr., nevertheless the circumstances here are such that the adoption and the claim of the adult adoptee are an abuse of the adoption process and of the will and a violation of testator's intent.
Ely knew that his father's will provided that in the event he died without children or issue of deceased children the *61 remainder of his trust would go to his brother Alfred or Alfred's then living issue. Ely had remarried in about 1956. On May 16, 1958 he executed a will which contained a provision requesting brother Alfred and his children to forego their rights to the remainder of Ely's trust so that his wife could have the income.
Alfred died on April 19, 1963. In about 1963 Ely began to discuss the possibility of adoption of Dyke. The adoption was suggested by Ely's attorney, David Cossaboom, having offices at Santa Ana, California. In Cossaboom's deposition he was candid with respect to the reason for the adoption:
Q. Could you tell me what considerations prompted your suggestion to your client that he give some thought to adopting his stepson?
A. The reason why I suggested to Ely Griswold that he adopt Marty was for the purpose of seeing that the remainder of the trust would pass to Marty if Ely should die without any other children.
Ely had telephoned Dyke from California at his home in Georgia and advised that he had been investigating the possibility of adopting him. Dyke did not recall discussing the motive for the adoption with Ely at that time.
It appears that there was some concern by Ely's attorneys in regard to the manner of presentation of the adoption to the court. A California attorney, Frank Manzo, had been engaged by Ely's attorneys to represent the adoptee; Dyke was not planning to attend the hearing. A letter from Cossaboom's associate, James E. Carter, to Ely, dated October 1, 1965, contained the following:
Since we now have a couple of weeks to prepare for the hearing, I have decided to change our attack somewhat. First, I have decided that it would be better for you not to mention the trust to the Judge unless he inquires into the matter. In answer to the question of why you would like the adoption, you could state your reason as of being the close tie between you and your step-son and any other fact as to why you would like the adoption. I do not know whether Martin Dyke's natural father is alive, and if he is, *62 what the relationship is between the two. I believe this would have a bearing on the case.
I talked to Mr. Manzo and he is at a loss as to what to say at the hearing since he is not acquainted with Martin Dyke. For that reason, would you please have Martin Dyke write a short note to Frank M. Manzo, Suite 325, 900 North Broadway, Santa Ana, California. Please ask him to set forth in the note that he requests that Mr. Manzo appear at the hearing for him and his desire to be adopted by you. He also could set forth in the letter something to the effect that there has been a bond formed between the two of you and that he no longer desires to retain the relationship of parent and child with his natural father, if his natural father is living. If his natural father is deceased, he should state that in the letter too. If he would do this, I think that Mr. Manzo would feel more comfortable at the hearing.
At Dyke's deposition on November 7, 1974 he said that his natural father was still living and resided in New York City; also that his natural father's consent was not necessary for the adoption.
It appears that the relationship between Ely and Dyke was friendly. Dyke said that he saw Ely frequently in 1946 and 1947 when he was living in Los Angeles, and probably saw him about eight times in eight months. Dyke then moved to Stockton, California, which is 350 or 400 miles from Los Angeles. He would drive down about once a month from Stockton to Newport, where his mother and Ely were living, would have a social visit, and sometimes Ely, an inveterate sailor, would show Dyke the boats. Dyke moved from Stockton, California to Memphis, Tennessee, in 1949. Thereafter he made three to five trips a year to California on business and always made it a point to "check in" with his mother and Ely. Dyke never lived in California again.
On one occasion Ely and his wife visited Dyke in Memphis. Subsequently Dyke moved from Memphis to New York City "via Boise, Idaho." During his stay in New York he visited his mother and Ely about once a year for three years, with perhaps an extra trip now and then. Dyke's first child, Amy, was born in 1959 and Ely was very interested and enthusiastic about the baby. It appears that Ely and Dyke got *63 along well; Dyke described the relation as very close. He said Ely had called him "son" for 20 years. When the adoption became final Ely wrote a letter to Dyke addressing his as "son" and referred to his "grandchild," a child recently born to Dyke and his wife. After the adoption the occasional visits continued and the relationship continued to be friendly. After the death of his mother, Dyke was very helpful to Ely, and Ely stayed with him for about a month. Ely named Dyke as executor in his will, but since the assets of the estate amounted to less than $5,000, the will was not offered for probate. Ely referred to Dyke's children as his grandchildren and was generous with gifts to them.
While the relationship was friendly and close and affectionate, it was not significantly different from that of a stepfather and stepson who liked each other and got along well. Ely undoubtedly gained pleasure from the Dyke children, whom he referred to as his grandchildren. However, all of this could have been the same without the adoption. It must be noted that Martin Dyke did not change his name and there is no evidence that the adoption affected in any way his relation to his natural father or that he even told him about the adoption.
The evidence indicates that the primary motive for the adoption was to gain the benefit of the trust remainder for Ely's wife and her son Martin Dyke. This motive necessarily involved the motive to divert the remainder from the children of Alfred Whitney Griswold. The latter may not have been the specific or sole motive but obviously it was a necessary consequence of the primary motive. The fact that there may have been other consequences and motivations, such as the pleasure of Ely at the legal relationship, is in my judgment only secondary and does not detract from the fact that the primary motive was as indicated. If there had not been a Griswold trust no one would have thought of the adoption.
*64 The fact that Dyke indicated he did not fully understand the purpose of the adoption or recall discussing the Griswold trust is not significant. The important elements are Ely's motivation and the probable intent of the testator.
In this situation the conclusion of the court in In re Comly, supra is applicable. The court said:
* * * While undeniably it is the policy of the Legislature to place adopted children on a level with natural children, such a policy should not be used to permit the adoption of adults for the sole purpose of giving them an interest in property. If any adult that Captain Comly chose to adopt qualified as a "child" under the will of Mary Comly, then, in effect, Captain Comly would have a power of appointment over the property and could lessen the shares of his natural children as much as he pleased without any obligation on his part to provide and care for the adopted "child". Such a result was obviously not intended by the court in Coe or by testatrix. * * * [90 N.J. Super. at 503]
For the reasons above stated it is concluded that the probable intent of this testator would clearly be to exclude the adult adoptee from inheritance under his will and that the remainder should be paid to the four children of Alfred Whitney Griswold.
Finally, it is suggested that the matter of inheritance by persons adopted as adults should receive the attention of the Legislature. Suggestions in this regard, worthy of attention, are made in Dean Halbach's article above referred to in 50 Iowa L. Rev. 971 (1965). Conceivably, at least prospectively, the Legislature could set an age limit below which an adopted adult would be deemed lawful issue of the adopting parent under "any testamentary or other document" unless such document or the circumstances exhibit a contrary intention. It is understood that bills were introduced in 1974 to affect situations involving the difference between ages 21 and 18, the new age of majority, but no action was taken thereon.
A judgment may be submitted in accordance with the above opinion.