98

[No. 12622-6-III.   Division Three.   February 22, 1994.]

BOBBY J. RHAY, *as Personal Representative,*
*Respondent,* v. CHARLOTTE JOHNSON, ET AL, *Appellants.*

*James K. Hayner* and *Minnick-Hayner, P.S.,* for appellants.

*Albert J. Golden* and *Golden & Knowlton, P.S.*, for respondent.

SWEENEY, J. — Charlotte Johnson appeals a court order granting Vera Graves' (Vera) motion for summary judgment, quieting title in testamentary trust properties devised to Vera by her adoptive parents/natural grandparents and appointing Vera as successor trustee for the trust.

Ms. Johnson contends: (1) Vera holds only a life estate with a contingent remainder in the trust property; (2) the trial court erred in not removing Vera as trustee because of her express intention to deplete the trust assets; and (3) Vera's adoption of 65-year-old Bobby Rhay did not satisfy the "issue of her body" contingency of the testamentary trust. Vera's death during the pendency of this appeal renders the issues of Vera's interest in the trust and her status as trustee moot. As to the remaining issue, we reverse the trial court's summary judgment and grant judgment for Ms. Johnson.

### FACTUAL BACKGROUND

The following facts are not in dispute. William A. and Laura E. Shelton executed similar wills in February 1922 (the Shelton wills). They had two living children at that time: Allen B. Shelton (Allen) and Alma Shelton Foster (Alma). A third child, Susie Shelton Schnase (Susie) died shortly after giving birth to Vera in 1916. After Susie's death, Vera lived with William and Laura Shelton. The Sheltons adopted Vera in 1923. William Shelton died in 1926 and his property was devised to his wife, who died in 1927; Vera was 10 years old at that time.

The Shelton wills placed the bulk of their property in a trust with Allen as trustee. The trust provided that he annually pay Alma $500 during her lifetime, "such payments to cease at the time of her death", and that he

> pay to each child of Alma A. Foster and C. U. Foster after such child shall have arrived at the age of majority, the sum of One Thousand Dollars . . .. In the event of the death of any

such child or children of the said Alma A. and C. U. Foster, without issue of his or her body, then the said sum so bequeathed shall be retained by the said Allen B. Shelton as such trustee and shall be distributed as is hereinafter set forth.

(c) He shall retain as his share of my estate out of the trusteeship an undivided one half of all of the remainder, and the other one half thereof he shall pay to my granddaughter, Vera L. Schnase, such payment not to be made until she shall have reached the age of 25 years. He shall handle that part of my estate as willed to my granddaughter Vera L. Schnase in such manner as in his judgment may be for the best interests of my said granddaughter . . .

. . . .

In the event of the death of the said Allen B. Shelton, not leaving issue of his body, that part of my estate which is devised to him shall descent [sic] to and vest in my said granddaughter Vera L. Schnase, and she shall be entitled to possession thereof if she shall be of the age of 25 years. If she shall not have arrived at the age of 25 years, the Union Trust Company as aforesaid shall act as such trustee until such time as she shall have arrived at the age of 25 years as aforesaid. In the event of the death of Vera L. Schnase before Allen B. Shelton, all property bequeathed to her shall immediately vest in Allen B. Shelton, and further, in the event of Vera L. Schnase outliving Allen B. Shelton and *dying without issue of her body*, then all property remaining hereby bequeathed to her and by her received from Allen B. Shelton, shall descend to and vest in the children of Alma A. Foster and C. U. Foster, who may be living at the time, share and share alike.

It being my intention that Ernest J. Schnase [Vera's natural father] shall not receive any of my property directly or indirectly and shall not have the handling of any of my property devised to Vera L. Schnase.

(Italics ours.)

Vera lived with Allen until she was 19 years old, when she moved to Seattle and later married. She reached age 25 in 1941, but the record is silent as to whether she received any benefit from the trust at that time. Allen continued to manage the trust until his death in 1967; he left no children. Vera's husband, Robert Graves, assumed management of the Shelton trust in 1967 and managed it until his death in 1983. Mr. Graves was never formally (or informally) appointed as the successor trustee, but apparently none of the beneficiaries of the trust objected.

In early 1976, Vera and her husband attempted to sell a parcel of trust property situated in Washington. After a title search confirmed the property was an asset of the Shelton trust, Vera's attorney recommended she buy the interest of the other trust beneficiaries in the property. Vera paid Alma's two surviving children, Charlotte Johnson and Allen Foster, $42,500 each for their interest in the property.

Sometime in 1977, Vera and Ms. Johnson (Allen Foster had apparently died by this time) entered into an agreement whereby Ms. Johnson agreed to quitclaim her interest as a beneficiary in a parcel of Washington property to Vera and Vera agreed to quitclaim her interest in a parcel of Montana property to Ms. Johnson. Both properties were assets of the Shelton trust. The agreement was not properly recorded.

As a result, in July 1986 Ms. Johnson brought an action in Montana to quiet title in the Montana property. Vera, a party defendant to the quiet title action, answered and claimed that her agreement to exchange quitclaim deeds had been based upon a mistake of fact or law, and that she now understood she owned a full fee simple absolute in the trust properties. The Montana court entered summary judgment in favor of Ms. Johnson. Following an appeal, the Montana Supreme Court affirmed the decision. It ruled that the agreement to exchange quitclaim deeds had been validly negotiated and was binding. The court did not address the question of whether Vera obtained a vested fee simple interest in the Shelton trust property upon the death of Allen and her turning 25 years of age.

In November 1986, Vera adopted her friend, Bobby Rhay; Mr. Rhay was 65 years old at the time. The adoption was apparently for the purpose of satisfying the testamentary provision which required transfer of the estate to the children of Alma and C.U. Foster in the event Vera died without "issue of her body".

In January 1987, Vera filed a complaint to quiet title in all remaining testamentary trust properties devised to her.

The complaint prayed for an award of fee simple title and judgment barring Ms. Johnson from asserting any right or title to property in the future. The complaint was amended in July 1987 to add a request for a determination of Vera's rights in the testamentary trust. Although Ms. Johnson filed an answer to the amended complaint that same month, there was no further activity in the case until Vera filed a motion for summary judgment on February 4, 1992, and requested that the court appoint her successor trustee. Ms. Johnson filed a cross motion for summary judgment on June 3, 1992.

The court filed an order on July 24, 1992, granting Vera's motion for summary judgment and appointing her successor trustee to the Shelton trust. Ms. Johnson appealed. Vera died on March 13, 1993, while this appeal was pending. Mr. Rhay, the personal representative of her estate, was substituted as respondent. Neither party addressed the effect of Vera's death on the issues raised by this appeal.

## DISCUSSION

Ms. Johnson contends the trial court erred in concluding that Vera's interest in the Shelton trust properties was in fee simple and in appointing Vera trustee. Both the specific nature of Vera's interest in the trust properties and the propriety of appointing her trustee are rendered moot by her death.[1] *In re Marriage of Irwin*, 64 Wn. App. 38, 59, 822 P.2d 797, *review denied*, 119 Wn.2d 1009 (1992); *Orwick v. Seattle*, 103 Wn.2d 249, 253, 692 P.2d 793 (1984). Further, the issue of Vera's interest in the Shelton trust properties no longer has practical significance. Whether her interest is characterized as (1) a life interest with a contingent remainder (issue of her body), or (2) a fee simple interest subject to complete defeasance upon her death without issue, Vera's interest vested in the remainderman upon her death. The dispositive issue is who is the remainderman.

---

[1]Vera does not argue that her interest was held in fee simple absolute and we therefore do not address that question.

### Adult Adoptee as "Issue of Her Body"

■  Our primary duty in interpreting a will is to determine the intent of a testator. *In re Estate of Niehenke*, 117 Wn.2d 631, 639, 818 P.2d 1324 (1991). As far as possible, the testator's intent is determined from the four corners of the will. *In re Estate of Fleischman*, 54 Wn. App. 795, 796, 776 P.2d 684, *review denied*, 113 Wn.2d 1025 (1989). Each provision of the will is construed in light of the entire instrument. *Fleischman*, at 796-97. If the intent can be ascertained and is lawful, it supersedes judicial rules of will construction. *In re Estate of Carlson*, 40 Wn. App. 827, 831, 700 P.2d 771, *review denied*, 104 Wn.2d 1008 (1985).

Washington's current adoption statute, RCW 26.33, grants adoptees "all rights and privileges, including the right of inheritance and the right to take under testamentary disposition, . . . of a natural child of the adoptive parent." RCW 26.33.260. The Washington Trust Act of 1984, RCW 11.02, defines "issue" as "the lawful lineal descendants of the ancestor and *all lawfully adopted children*." (Italics ours.) RCW 11.02.005(4). In 1922, when the Shelton trusts were executed, an adult over the age of 21 could not be adopted. Laws of 1905, ch. 155. By the time the Sheltons died and the trusts began, an adult could be adopted. Laws of 1927, ch. 158. Specific provisions for an adoptee's inheritance rights were not established, however, until 1943. Laws of 1943, ch. 268. Terms such as "kindred of such ancestor's blood" and "blood of such ancestors" were defined to include "any child lawfully adopted by one who is in fact of the blood of such ancestor" in the probate laws of 1945. Laws of 1945, ch. 72.

Ms. Johnson contends her grandparents did not intend to bequeath their property to an adopted adult stranger, to the exclusion of their natural grandchild. She argues the Sheltons clearly revealed their intent to benefit only natural lineal descendants by choosing to limit the remainder vesting upon Vera's death to the "issue of her body", and if none, to the "children" of Alma.

Ms. Johnson relies on *Trueax v. Black*, 53 Wn.2d 537, 335 P.2d 52 (1959). In *Trueax*, the testator devised a life estate to his daughter, Ida May, with the remainder to specifically named children and grandchildren if Ida May died "without children living". *Trueax*, at 540. After the testator's death, Ida May adopted a 15-year-old niece. The court held that

> [t]he crucial question is *not* whether [the testator] intended a stranger to the blood who might subsequently be adopted by Ida May to receive the property upon her death, but whether he intended [the adoptee] to receive it (in default of lawful issue of Ida May) to the exclusion of the nine heirs named in his will. It seems to us that the answer to this question must be in the negative . . ..

*Trueax*, at 546. The *Trueax* court referred to the adoption as a blatant effort to thwart the testator's plan for the disposition of his real property upon her death. *Trueax*, at 546.

Courts in several jurisdictions follow the *Trueax* rationale, that a testator is not likely to anticipate an adoption years after the testator's death which will frustrate the testator's desire to keep the property within the "bloodlines" of the family. *See, e.g., Thomas v. Thomas*, 258 N.C. 590, 129 S.E.2d 239 (1963) and *Merson v. Wood*, 202 Va. 485, 117 S.E.2d 661 (1961), which cite *Trueax*. *See also Morgan v. Keefe*, 135 Conn. 254, 63 A.2d 148 (1948); *Stewart v. Lafferty*, 12 Ill. 2d 224, 145 N.E.2d 640 (1957); *Third Nat'l Bank & Trust Co. v. Davidson*, 157 Ohio St. 355, 105 N.E.2d 573 (1952). Cases following this rule

> practically all involve situations where the adoption took place long after [the] testator's death, and often under circumstances suggesting an attempt to create an heir for the purpose of defeating a gift over conditioned on the nonexistence of children at the termination of the first limited estate. Mooney v Tolles, 111 Conn 1, 149 A 515, 70 ALR 608 [(1930)].

2 Am. Jur. 2d *Adoption* § 94, at 296 n.6.2 (Supp. 1993). The rule is the so-called "stranger to the adoption" rule.[2]

---

[2]The "stranger to the adoption" rule "presumes that a testator or settlor who is not the adopter would not intend to include adopted children within a class designation." *In re Trusts of Sollid*, 32 Wn. App. 349, 354, 647 P.2d 1033 (1982).

This court both distinguished and limited *Trueax* to its facts in *In re Trusts of Sollid*, 32 Wn. App. 349, 647 P.2d 1033 (1982). There, we held that *Trueax* did not create a presumption which disfavored adopted children. *Sollid*, at 358-59. Relying on *Wilmington Trust Co. v. Huber*, 311 A.2d 892 (Del. Ch. 1973), we concluded that a settlor is presumed to understand "that a statute fixing the rights of an adopted child would be subject to change; thus, a statute requiring adopted children [to] be treated as trust beneficiaries was retroactively applied." *Sollid*, at 357.

The testamentary trust in *Sollid* provided: "'Upon the death of the last of the three named beneficiaries, then the corpus of the trust shall be delivered and paid to the then surviving issue, including lineal descendants, of the three beneficiaries, per stirpes.'" (Italics omitted.) *Sollid*, at 357. One of the three named beneficiaries had adopted three children, and descendants of the remaining two beneficiaries claimed the adopted children were not intended to share in the trust. The trial court, relying on *Trueax*, denied a share of the trust to the adopted children. On appeal, we held that absent a settlor's specific contrary intent or a contrary intent implied by "the surrounding facts and circumstances", adoptees are presumed included in the definition of "issue" or similar terms. *Sollid*, at 354-55, 357-58. But we also noted that the adoptee in *Trueax* would have received property to the exclusion of nine heirs named in the will, unlike the adoptees in *Sollid*, who merely shared the trust property with other beneficiaries. *Sollid*, at 356.

■ As we noted in *Sollid*, adult adoptees present a unique complication:

> Recognizing that adoption may be used solely for financial gain or as a spite device, thus frustrating the wishes of the transferors, several statutes [in other states] provide that, for purposes of construing class gifts, adoptees are to be treated as if they were natural-born children in the absence of evidence of a contrary intention, *if such adoption occurred during the adoptee's minority.*

*Sollid*, at 354 n.5 (citing John R. Steincipher, *The Adopted Child and Testamentary Class Gifts*, 1 Gonz. L. Rev. 31, 49-

50 (1966)). Several jurisdictions have specifically denied an adopted adult's claim on an estate, especially when this adoptee would defeat or diminish the interests of other "natural family" beneficiaries. *See, e.g., In re Estate of Pittman*, 104 Cal. App. 3d 288, 163 Cal. Rptr. 527 (1980); *Merson*, at 489-90; *In re Estate of Griswold*, 140 N.J. Super. 35, 354 A.2d 717 (1976) (permitting an adult adoptee to share in the estate would constitute an abuse of the adoption laws for personal gain).

As in *Trueax*, the question here is not whether the Sheltons intended a stranger to the blood adopted by Vera to receive the property upon her death, but whether they would have intended an adopted 65-year-old adult to receive it to the exclusion of their natural grandchild. *Trueax*, at 546. When the issue is so phrased, the answer is clearer. We think not. This conclusion is consistent with the rationale for treating natural and adopted children the same:

> [I]t is not the biological act of begetting offspring . . . but the emotional and spiritual experience of living together that creates a family. The family relationship is created far more by love, understanding, and mutual recognition of reciprocal duties and bonds, than by physical genesis.

*Sollid*, at 352 (quoting *In re Will of Patrick*, 259 Minn. 193, 196, 106 N.W.2d 888, 890 (1960)). Vera's relationship with Mr. Rhay was not that of mother and son. While there may well have been respect and support, there was none of the love, understanding and mutual recognition of reciprocal duties and bonds normally associated with a mother-son relationship.

It is neither possible nor desirable to establish a hard and fast rule regarding the legal status of adopted children in these will disputes. Courts must look to the intention of the testator and the facts surrounding the particular adoption. In this case, Mr. Rhay, like the adoptee in *Trueax*, would take the Shelton trust property to the exclusion of a named beneficiary who is the "natural" grandchild of the testators. Unlike the *Sollid* adoptees, the motivation for adopting Mr. Rhay was in part to affect the result under the Sheltons'

testamentary remainder plan.[3] Although the Shelton wills do not specifically exclude adopted children from qualifying as issue of Vera's body, the surrounding circumstances support the conclusion that the Sheltons would not have intended that a 65-year-old adopted man inherit their property to the exclusion of their other natural grandchild. *Trueax*, at 546.

The decision of the trial court is reversed and judgment granted to Ms. Johnson.

THOMPSON, C.J., and MUNSON, J., concur.

---

[3]In oral argument, Vera's attorney conceded that she adopted Mr. Rhay to reward him for service to her.