152 N.J. Super. 308 (1977)
377 A.2d 1201
IN THE MATTER OF THE ACCOUNT OF THE TRUSTEE OF THE ESTATE OF MINNIE E. NICOL, DECEASED.
Superior Court of New Jersey, Appellate Division.
Argued March 22, 1977.
Decided July 15, 1977.
*309 Before Judges MATTHEWS, SEIDMAN and HORN.
Mr. W. Richard Kahn, guardian ad litem for infants Christopher B. Bensley, Jennifer Bensley and Zachariah Bensley, appellant, argued the cause pro se.
Mr. James R. Hillas, Jr., guardian ad litem for infants John Stanley Hickman and Brooks Allen Hickman, respondent, argued the cause pro se.
Respondent trustee, United States Trust Company of New York, did not file a brief.
The opinion of the court was delivered by SEIDMAN, J.A.D.
*310 In its complaint to settle the final account of the trust established under the last will and testament of Minnie E. Nicol, deceased, The United States Trust Company also sought a construction of that portion of the will which directed the trustee, upon the termination of the trust, to divide the principal thereof into as many equal parts "as there are issue (or lineal descendants) of myself then living," and to pay over an equal share to each.
The question presented below, as well as on this appeal, is whether the gift to "issue (or lineal descendants) of myself" included adults adopted by testatrix' son after her death. The trial judge held that it did, and entered judgment which so construed the words, in addition to allowing the final account and awarding commissions and fees.
This appeal was filed by the guardian ad litem of certain infant blood descendants of testatrix. Respondent guardian ad litem represents the interests of two infants whose mother was one of the persons adopted by testatrix' son. As they did below, the parties have stipulated the pertinent facts.
Minnie E. Nicol died on May 14, 1939, a resident of New Jersey, leaving a last will and testament dated October 26, 1935. Her will was admitted to probate on July 21, 1939. The third article of the will provided as follows:
THIRD: All the rest, residue and remainder of my property, real and personal, of whatever kind and wherever situate, including all my Stocks, Bonds, Mortgages, Notes, Accounts or other Securities, of which I may die seized or possessed, or to which at the time of my death I may be in any manner entitled, I give, devise and bequeath unto United States Trust Company of New York, its successors and assigns, to have and to hold the same IN TRUST for the following uses and purposes and subject to the terms, conditions, powers and agreements hereinafter set forth:
To receive, hold, manage, sell, invest and re-invest the same and every part thereof in the manner hereinafter specified, and to collect and receive the rents, issues, interest, profits and income thereof, hereinafter called "Income", and after paying therefrom the necessary and proper charges and expenses in connection with the conservation and administration of the Trust, to divide the principal and net income as follows:
*311 To my grandchildren, and to my son, Alexander Kenneth Nicol, and/or to the survivors who may be living during the continuance of the Trust hereby created, I direct my Trustee to pay quarterly, in equal shares or amounts, sixty per cent (60%) of the net income of my Estate, and the remaining forty per cent (40%), to my sisters during their joint lives, and unto the survivor or survivors, in equal shares or amounts, and from and after the death of my last surviving sister, unto the Women's Missionary Society of Central Presbyterian Church of Summit, New Jersey, or successors.
The Trustee shall retain the principal sum of the Trust Estate hereby created, until twenty (20) years after the death of the last survivor of my said sisters and myself, and shall then divide the same, after payment of all proper charges into as many parts or shares as there are issue (or lineal descendants) of myself then living, and convey, assign, transfer, set over and deliver unto each of said surviving issue, one equal share of the principal sum of said Trust Estate. [Emphasis supplied]
Testatrix was married to Alexander R. Nicol. They had four children, three of whom later had natural children and grandchildren of their own. The fourth, Alexander Kenneth Nicol (hereafter Alexander), born in 1911, was a resident of California when he married Frances May Williams in July 1939. She was a divorcee with four children ranging in age from 15 to 19 years. Alexander thereafter treated the children as his own and contributed to their support and maintenance.
In July 1952, when the stepchildren were from 28 to 32 years of age, Alexander instituted proceedings in California for their adoption. This followed the passage in 1951 of an amendment to the California adoption statute, prior to which the parties agree it would have been impossible to effect their adoption without the consent of, or notice to, their natural father, whose whereabouts were unknown. Alexander died in 1961.
Citing In re Coe, 42 N.J. 485 (1964), and In re Thompson, 53 N.J. 276 (1969), the trial judge held that
* * * it must be presumed under the circumstances surrounding the execution of this will that the testatrix intended to include as "issue" any children thereafter adopted by her son while they were minors. If her son had thereafter adopted his four step-children *312 when one or more, but not all, of them were still minors, but others had attained majority, it could not logically be presumed that she intended to include the former but to exclude the latter.
He also expressed the view that Alexander had not adopted the stepchildren solely for the purpose of qualifying them as beneficiaries under his mother's will, and that "the presumed intent of the testatrix was to include her son's adopted children even though they were adopted as adults."
If the result reached below had turned solely on the issue of Alexander's motive in adopting his stepchildren, we would be less inclined to disturb it, even though we suspect, notwithstanding the absence of any fraudulent intent, that Alexander's probable motive was to assure their sharing in the distribution of his mother's testamentary trust. However, we question the soundness of the trial judge's conception of the "presumed intent of the testatrix."
It is fundamental that the primary objective in construing the provisions of a will is to ascertain and give effect to the probable intention of the testator. Fidelity Union Trust Co. v. Robert, 36 N.J. 561 (1962). See also, In re Cook, 44 N.J. 1 (1965); Clapp, "Justice Nathan L. Jacobs  The Doctrine of Probable Intent," 28 Rutgers L. Rev. 251 (1975).
* * * [I]n ascertaining the subjective intent of the testator, courts will give primary emphasis to his dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding facts and circumstances. * * * So far as the situation fairly permits, courts will ascribe to the testator, "those impulses which are common to human nature, and will construe the will so as to effectuate those impulses." [Citations omitted]. * * * [T]he court's endeavor is to put itself in the testator's position insofar as possible in the effort to accomplish what he would have done had he "envisioned the present inquiry." * * * [Fidelity Union Trust Co. v. Robert, supra, 36 N.J. at 564-566, citations omitted]
Here, to a degree, testatrix made known her intent respecting the ultimate distribution of the trust corpus. She provided for its division among the "issue (lineal descendants) *313 of myself then living." The problem is to ascertain who is to be included among the "issue." More precisely, it is whether her son's stepchildren, adopted by him when they were adults, can be considered as "issue" of testatrix, a "stranger to the adoption." As Alexander did not marry until after her death, and the adoption took place many years later, she obviously could not have had any actual intention as to the matter. Since it is the task of the court, according to Robert, to "accomplish what [testatrix] would have done had [she] `envisaged the present inquiry,'" Clapp, op. cit. at 257, we must consider whether it is reasonably probable, in the absence of any indication to the contrary, that testatrix would have considered them as her issue or lineal descendants, in the context of the trust, had the events occurred prior to the drafting of her will.
The case of In re Coe, supra, swept away prior concepts concerning the inclusion of adopted children in testamentary gifts to a child, children or issue of one other than the testator. An earlier view, expressed in In re Fisler, 133 N.J. Eq. 421 (E. & A. 1942), was that the word "issue" signified prima facie "heirs of the body," and under the Adoption Act then in effect an adopted child would not be "capable of taking property expressly limited to the heirs of the body of the adopting parent or parents. * * *" 133 N.J. Eq. at 423. The question, said the Fisler court, was essentially one of intent. The adoption in issue there took place 23 years after testatrix' death. There was no indication in her will "that the testatrix designed by the use of the term `lawful issue,' to include those not of the blood among the objects of her bounty." 133 N.J. Eq at 423. But in the later case of In re Wehrhane, 23 N.J. 205 (1957), a majority of the court rejected the Fisler interpretation of "issue." Id. at 209. The same end result was reached, however, by the majority's adherence to the position that under "decisional law of our State * * * a provision for a `child,' `children' or `issue' of another is presumed not to include an adopted child or children." Id. at 208. As Coe explains (42 N.J. at 488), *314 the majority in Wehrhane held such words to mean, as to instruments executed by "strangers to the adoption," i.e., anyone other than the adopting parent, "only descendants of the blood unless it appears from the instrument or attendant circumstances that adopted children were intended to be included."
Coe disapproved the Wehrhane view that "children" presumptively meant only natural children in the will of one other than the adopting parent. 42 N.J. at 493. Its rationale was as follows:
* * * We think the [adoption] statute [of 1877] goes beyond merely prescribing a right of inheritance between the adopting parent and the adopted child. It expressly provides for cross-inheritance between natural and adopted children of the adopting parent. Further, the second paragraph of the statute, quoted above, by providing that an adopted child may not take by representation property coming from collateral kindred of the adopting parent, inferentially contemplates the child may so take from lineal kin. And the provision in the same paragraph of the statute that the adopted child shall not be capable of taking property "expressly limited to the heirs of the body of the adopting parent" plainly relates to the interpretation of some instrument and nothing in the statute limits it to the will or deed of the adopting parents.
At any rate, it is not important whether the adoption statute directly controls the interpretation of instruments. The important point is that the statute reflects the feeling and attitude of the average man and hence its policy should be followed unless the benefactor explicitly reveals a contrary purpose. * * * [at 489; emphasis supplied]
The court said that it was not probable that strangers to the adoption would differentiate between the natural child and the adopted child of another. Rather, it was more likely that the relationships established by the parent would be accepted without discrimination on a biological basis. 42 N.J. at 492. Thus, the conclusion to be drawn from Coe is that it should not be assumed that terms such as the "lawful children" of a beneficiary named in a will were intended to exclude adopted children.
*315 Though it considered that the same result should be reached as to the term "issue," Coe chose to leave open the question as it applied to wills executed prior to Wehrhane and in reliance on Fisler, "so that the possible equities may be weighed in a specific setting," in light of earlier case law and the intervening amendment of the adoption law. 42 N.J. at 495.
The reserved matter was considered and resolved in In re Thompson, supra. The question there was whether a testamentary gift to "lawful issue" of the testator's daughter included a child adopted by the daughter after testator's death, there being nothing in the will itself to indicate that "the testator thought of the problem and entertained a view as to whether an adopted child should take." 53 N.J. at 279.
Reaffirming its previous view in Coe, disapproving Wehrhane, that the testamentary use of the term "lawful children" of a beneficiary would, in the absence of an expressed contrary intent, encompass adopted children, the Thompson court, after an exhaustive analysis of the subject, concluded that the Fisler concept of "issue" as meaning "heirs of the body," thereby excluding adopted children, should be overruled. The court said further:
In the last analysis, it is the intent of the testator which here controls, and the controversy relates only to a canon of construction bearing upon the search for his probable wish. We see no reason why Fisler must be overruled prospectively only [53 N.J. at 299]
The court reasoned that:
* * * a case holding that "issue" does not include an adopted child may reflect, not the special meaning of "issue," but rather an assumption that donors generally prefer the blood line, an assumption which would equally exclude the adopted child from all generic words of filial import. That assumption figures in the stranger-to-the-adoption concept which presumptively bars the adopted child, whatever the generic term used, except when the donor was the adoptive parent. That exception seems anomalous, for if donors harbor a preference for the blood line, one would expect it to be as compelling, or more so, when donors speak in terms of their own "issue." The anomaly may be only debatably so when the donor adopted the child before executing the instrument, for it could be argued he would likely want to fulfill the parental obligation he had assumed by adoption, while on the other hand it could be urged that, being aware of the *316 adoption, his use of a term of supposed biological import points to a conscious decision to exclude the adopted child. But when the adoption occurred years after the execution of the instrument, especially an irrevocable inter vivos trust, the anomaly seems evident, since it is difficult to suppose a donor intended "issue" to include a child he might adopt years later but to exclude a child adopted by a child of his own. [at 282-285]
It is worth repeating for the sake of emphasis that the underpinning of both Coe and Thompson is the ascertainment of testator's probable intent with respect to the inclusion of adopted children in testamentary gifts to a child or children or issue of a person other than testator. This is consistent with the objective of will construction expressed in Fidelity Union Trust Co. v. Robert, supra. Also to be stressed is that both Coe and Thompson turn on the sociologically desirable assumption that since it is unlikely that one would differentiate between a natural child and an adopted child of another, the probable intent of a testator in making testamentary gifts of the kind here involved, stated in a negative fashion, is not to exclude such adopted children from a class designated as "child," "children" or "issue."
The question to which we must now address ourselves is whether the rationale of Coe and Thompson may be applied to adopted adults. Those cases specifically involved adopted children. No mention at all was made in either of adopted adults. The subject has not hitherto been considered on an appellate level in any reported case in this State, although it has received attention in two reported trial court decisions. One, In re Comly, 90 N.J. Super. 498 (Cty. Ct. 1966), involved a proceeding brought by an adopted daughter of testatrix' half-brother to compel distribution to her of a portion of a trust fund established in testatrix' will, which was probated in 1936. At the time of the adoption, which took place in 1965, plaintiff was about 36 years of age, married and living with her husband, and had four children. The proofs indicated that the sole purpose of the adoption was to enable plaintiff and her family to remain in a home *317 they occupied in which the half-brother was given a life interest under his mother's will, with the remainder going to his children. The trial judge held that the acceptance of an adopted child by third persons, the basis of the decision in Coe, "would not occur where the adopted `child' is a 36-year old married woman with four children, who was adopted merely to give her an interest in the home in which she was living with her family. * * * Surely [testatrix] did not envision that her half-brother's `children' would include an adopted adult." 90 N.J. Super. at 502.
The other case, In re Griswold, 140 N.J. Super. 35 (Cty. Ct. 1976), squarely raised the issue of "whether an adopted adult is a child of the adopting parent within the meaning of a will of a third person, a `stranger to the adoption,' which provides that upon the death of the life tenant (the adopting parent) the remainder shall be paid to his children or issue of deceased children." 140 N.J. Super. at 37-38.
Testator in Griswold died in 1952, leaving a will executed in 1950. The will directed that the residue of the estate be divided equally into two trusts, one each for the benefit of his sons during their lifetimes. The remainder of each trust was left to "such children or issue of deceased children of my said son as shall then be living, per stirpes." Griswold's son Ely, who resided in California, was divorced in 1951. In 1955 or 1956, he married a woman with whom he had had a "relationship" for about ten years. She had a son from a prior marriage who was then 31 years of age. In 1965, when Ely was 56 and his stepson 41, he instituted proceedings in California to adopt his stepson. Ely died in 1973, survived only by his adopted son. Upon Ely's death the trustee filed a final accounting of the trust for the benefit of the decedent and sought instructions as to the final distribution of the corpus and accumulated income of the trust, claim to which was made by decedent's adopted son and the four surviving children of decedent's brother.
In a well-reasoned and perceptive opinion, the trial judge thoroughly discussed the applicability of New Jersey, rather *318 than California law; the probable intent of testator; the applicability and affect of In re Coe; the effect of the adult adoption statute, N.J.S.A. 2A:22-3, and whether the adoption constituted an abuse of the will and fraud.
The trial judge in Griswold determined that the probable intent of testator was not to have an adopted adult of one of his sons considered as a child for purposes of the testamentary trust. Essentially, the conclusion reached was predicated not so much upon any legal distinction between an adopted child or an adopted adult with respect to testamentary gifts to children or issue of a person by one other than the adopting parent, but rather because of the "attendant circumstances" as found by the trial judge. The judge reasoned that while there was nothing in the case to establish that the subject of adult adoptees as "children" of testator's sons had been discussed with counsel or specifically considered, nevertheless testator was aware of his son Ely's marital problems and financial difficulties. These facts, among others, coupled with testator's pride of family, led the judge to believe that if testator had envisaged the present inquiry, he would strongly have disapproved a diversion of the remainder of the trust, which would otherwise pass to the Griswold family, to an adopted adult. 140 N.J. Super. at 47-48.
Beyond this, Griswold construed the concepts and language of Coe not to be necessarily applicable to an adult adoption. The judge said:
* * * There is no indication that the Supreme Court meant that the feelings and attitudes of people toward adopted adults are the same as toward adopted children; it is doubted that it would so find. The adoption of children and the adoption of adults involve quite different considerations and different factors of policy and require and receive different treatment. The basic purpose of child adoption is to provide and protect the welfare of children, to provide homes and families and security for homeless children, and to provide children for couples who desire to have children to love and raise and maintain. A substantial factor here is the duty and obligation of support and maintenance.
In an adult adoption the relation between the parties is different, the motivation can be quite varied, and such adoptions are treated *319 differently in the statutes. Adoption of adults is ordinarily quite simple and almost in the nature of a civil contract. (California requires an agreement signed by the parties whereby, as in this case, they agree to assume toward each other the legal relationship of parent and child). The complete severing of the relation to natural parents is not accomplished in an adult adoption; the relation remains in New Jersey as to inheritance in case of intestacy of the natural parents. [140 N.J. Super. at 51-52]
We thoroughly agree with the foregoing; it accords with our own thoughts on the matter. The distinction between adopted children and adopted adults is by no means an idle one in the search for the probable intent of a testator. It is one thing to ascribe to a testator a contemplation of the possibility of that which has come to be relatively commonplace, namely, the adoption of a child at some time in the future by a member of the family or other relative, or any other prospective beneficiary under a will. Frequently, in such cases, the child is acquired in infancy, although the child may be older where a spouse adopts a stepchild. In both instances, however, the child is reared as one's own by the adopting parent and is recognized as such among the family and friends.
But it is quite another matter where the adopted person is an adult. It would be difficult to apply to such cases the sensible underlying considerations of Coe and Thompson. One would be hard-pressed to ascribe to a testator, in the absence of any expression thereon or of clarifying attendant circumstances, a probable intent to include an adopted adult among the children or issue of a testamentary beneficiary. It is extremely unlikely that a testator would foresee the likelihood that his or her child, or any other prospective beneficiary, might at some time in the future adopt an adult. It is equally improbable that an adopted adult would be embraced in the bosum of the family members other than the adopting parent, as would an adopted child. We find nothing in the adoption statutes (N.J.S.A. 9:3-17 et seq. (children), N.J.S.A. 2A:22-1 et seq. (adults)) which would support a contrary view. Actually, the fact that at the time of the *320 liberalizing revision of the child adoption law, L. 1953, c. 264 particularly with respect to inheritance, comparable amendments were not made to the adult adoption law, suggests a legislative intent to differentiate between the two types of adoption. See Griswold, supra, 140 N.J. Super. at 56-60.
It is to be noted that in the case under review, unlike Griswold, one cannot point to specific "attending circumstances" from which to infer a probable intent on the part of testatrix not to include adopted adults as children or issue of her son Alexander. But the absence of such circumstances may in itself support the inference, particularly where, as here, testatrix' son was unmarried when she died and the record is devoid of any evidence that she could possibly have foreseen the possibility that if or when her son married, his wife would be considerably older than he, with children the youngest of whom would be only 13 years younger than the stepfather and the eldest 10 years younger. While a stranger to the adoption, motivated by high-minded principles, would be quick to accept and welcome the relationship between an adopting parent and an adopted child, we cannot say that this would be true in the case of an adopted adult.
The trial judge here hypothesized that if testatrix' son had thereafter adopted his four stepchildren when one or more, but not all, were still minors, "it could not logically be presumed that she intended to include the former but not the latter." That may be so, but the short answer is that the facts here are different. Assuming that the hypothetical situation may have constituted sufficient "attendant circumstances" to warrant the suggested result, it does not lead to the result reached here. We are convinced that on the facts here present the trial judge erred in construing the will so as to include the adopted adults.
We accordingly reverse so much of the judgment under review as construes testatrix' will "so that the words `issue (lineal descendants)' include the adopted children of her son, Alexander K. Nicol." No costs.