933 A.2d 628 (2007)
396 N.J. Super. 218
In the Matter of The TRUST UNDER AGREEMENT OF Blanche P. Billings, VANDER POEL.
Superior Court of New Jersey, Appellate Division.
Argued January 18, 2007.
Decided October 17, 2007.
*629 Harvey Fruchter, Kenilworth, argued the cause for appellant Jane Vander Poel (Law offices of Harvey Fruchter, attorney; Tejas S. Kapadia, Frank Jackson, Michael Garcia and Mr. Fruchter, on the brief).
*630 Thomas H. Sullivan, Montclair, argued the cause for respondent Halsted B. Vander Poel II (Garrity, Graham, Favetta & Flinn, attorneys; Mr. Sullivan, on the brief).
Before Judges STERN, COLLESTER and LYONS.
The opinion of the court was delivered by
COLLESTER, J.A.D.
As the daughter of business entrepreneur and real estate tycoon C.K.G. Billings, Blanche Pauline Billings was a very wealthy woman. She married William Halsted Vander Poel and gave birth to three children: Benjamin Farnsworth Vander Poel, Mary Wendell Vander Poel, and Halsted Billings Vander Poel. Blanche and her family lived on 5th Avenue in New York City and owned a vacation home in Oyster Bay, Long Island.
Although she never lived in this state, Blanche created and executed three identical, irrevocable, and non-amendable trusts in New Jersey on November 2, 1950, one for each of her three children. The principal of each trust was 10,000 shares of Union Carbide & Carbon Corporation, one of the companies founded by Blanche's father. The trust for Halsted provided that he was to receive the trust income until his death. Thereafter the income was to be distributed among his living issue per stirpes until termination of the trust, when the corpus was to be equally divided among Blanche's living issue. The trust indenture defined "issue" only as "lawful issue," and specifically provided that all questions pertaining to the construction, validity, and execution of the trust were to be determined in accordance with the laws of the State of New Jersey.
When the 1950 trust was created, both Blanche's son Benjamin and her daughter Mary were married, and had six children between them. Halsted had no children and remained single until May 31, 1952, when he married Dorothy Marlatt. Dorothy had a young daughter, Jane Reid, from a prior marriage to James Edward Reid, who died in 1972. Dorothy and James divorced when Jane was four. According to Jane, Reid never visited her after the divorce. Halsted, Dorothy, and Jane settled in the Washington, D.C. area, and Jane attended a private school using the name Jane Vander Poel. Dorothy gave birth to three other children: Virginia in February 1953, Deborah in October 1954, and Halsted, II in November 1955. After the birth of each grandchild Blanche established and funded a trust for their individual benefit, but she never did so for Jane.
In 1956 Halsted and his family emigrated to Rome, where Dorothy and Halsted lived for the next forty years. The children were sent to boarding schools in the United States and Europe. Jane attended the Dobbs School in New York and later studied at an art school in Florence. She spent family holidays in Rome, traveling with the family to vacation destinations, or visiting Blanche and William at their home in Oyster Bay. Throughout this time Jane used the last name Vander Poel, and a family passport listed her under that name. Blanche was very aware that Jane was known as a Vander Poel. Jane certified that she visited Blanche during the time she lived in New York and that Blanche treated her no differently than the other Vander Poel grandchildren.
In the late 1950s and early 1960s, while Halsted and Dorothy lived in Rome, they discussed Halsted adopting Jane. Dorothy wrote to their family lawyer in Washington inquiring about a formal adoption. The letter read:
Janie is now eighteen as of 9 January, and we want to check again, both in *631 New York and in Washington, as to which place would be the most favorable for you to make arrangements for her legal adoption and change of name to Vander Poel.
She's most anxious to have this done, and we have written to our lawyers in New York, but it also occurred to us that with my mother living in Washington it might possibly be easier to have the arrangements made there. I'm not exactly sure which place we are residents of at the present time, but the main thing is that there should be as little publicity as possible in regard to this change.
As you well understand, Janie is [illegible] very worried about the possibility that she might have to stand up in a huge court of law and be confronted by Mr. Reid. I am quite sure you have already told us that this would not be necessary, but if you could write in detail as to what are the exact formalities involved, so that I in turn could write her, everything would be made easier, as she would be facing a known fact [illegible].
On January 27, 1960, the attorney responded:
I have given considerable thought to your letter of January 11, 1960 with respect to the possibility of having Jane adopted by Hawley. You will recall that this subject came up in 1958. We explored the possibilities at that time and came to the conclusion that it would difficult, if not impossible, to accomplish it either in the District of Columbia or New York. While I am not an authority on the latter, I believe [New York counsel] was rather pessimistic about the question of jurisdiction and I suspect the same is probably true today.
With respect to the District of Columbia, adoption is only possible where the petitioner (Hawley) is a legal resident of the District, or has actually resided here for one year prior to filing the petition, or if the child is under the jurisdiction of a welfare agency in the District. Obviously, the latter two conditions are not met and, as we pointed out earlier, any claim that Hawley is a legal resident of the District necessarily is contradictory to your position with respect to your liability for D.C. income tax. In addition, there is a practical difficulty that an investigation must be made by the Department of Public Welfare of the District of Columbia concerning the home surroundings, etc., of the child. This investigation would be impossible under the present circumstances.
Accordingly, we believe that no action to adopt Jane can or should be taken by Hawley in the District of Columbia at this time. I have the same feeling with respect to New York although your attorneys there may have different thoughts on it. In any case, I can assure you should proceedings be started in the District (for example if you should return here permanently), they will not be in open court. The statute here may require that notice of such proceeding be sent to Mr. Reid but any hearings are in the judge's chamber or in a sealed courtroom and not available for public inspection. In other words, everything is done as quietly and privately as is possible consistent with the legal rights of all persons involved.
I am sorry that I cannot be more optimistic about going through with adoption at this time but I believe you would be better advised to wait until you return to this country permanently before doing so. At the same time, there is one thing which might be taken care of now. As I recall from reviewing our correspondence in 1958, the suggestion was *632 made that Jane might, by will, preclude her natural father from inheriting any of her estate. At that time she was only sixteen and could not make a valid will. Now that she is eighteen years of age, however, she can execute a valid will with respect to her personal property at least, and you may wish to consider having her do this if the possibility that Mr. Reid might inherit some of her property is sufficiently important.
The family attorney prepared affidavits to enable Jane to obtain a passport and other identification in the name of Vander Poel, but no steps were taken by Halsted to adopt Jane until a petition was filed in New York Family Court in December 1981. The adoption was approved on December 23, 1981. In the interim, on December 28, 1964, Blanche created another trust, this one in the State of New York, with her husband William as income beneficiary; upon his death, the income was to be paid in equal shares to Blanche's children for their lives and thereafter to their "issue" until its termination. This trust also gave each of the children a power of appointment among their issue, and this time a different definition was given to "issue":
The words "descendant" or "issue" as used in this Agreement shall not include any adopted child or children or issue of any adopted child or children, and the words "child" or "children" as used in this Agreement shall not include an adopted child or children.
On that same day Blanche also signed her last will and testament. After providing for her husband, she directed that the residue be given to her children in unequal shares in an effort to ensure equality among her grandchildren in the event that the powers of appointment in the 1964 trust were executed. The definition of "issue" in the will mirrored the 1964 trust by stating that the words "descendants," "issue," "child," or "children" did not include an adopted child. The will explained that no bequests were made to Blanche's "grandchildren," because they had been otherwise provided for. However, amongst the specific bequests to Blanche's son-in-law, daughters-in-law, friends, and employees, there was a bequest of $10,000 to "JANE REID VANDER POEL, who is the stepdaughter of my son, HALSTED BILLINGS VANDER POEL."
The record before the Chancery judge shows that Halsted treated Jane no less than his natural children. In fact, he made substantial gifts to her of over $1 million, while his other three children together received a total amounting to only about $300,000. And when Halsted died in 2003, his will devised his remaining interest in Blanche's 1950 trust, amounting to potentially about $1,120,000, to a trust, which, after Dorothy's death, went to Jane as sole income beneficiary for life, and only thereafter to his other living children and their issue.
Fleet Bank, successor trustee of Blanche's 1950 trust, filed a complaint on February 3, 2004, seeking instructions for distributions under the 1950 trust agreement following receipt of a letter from the attorney for Halsted II, asserting that Jane should not share in the class gift to Halsted's issue because she was adopted by him as an adult. Jane responded that she was qualified to share in the class gift in the 1950 trust because, even before the adoption, Halsted treated her as his daughter and wanted her known as a Vander Poel. After discovery, cross-motions for summary judgment were filed by counsel representing Halsted and Jane, each maintaining that the matter was appropriate for this disposition by the court. On September 20, 2004, Judge Rosemarie Ruggiero Williams granted summary judgment *633 in favor of Halsted II and denied Jane's cross-motion. This appeal followed.
When interpreting the meaning or effect of a term in a will, deed of trust, or like instrument absolutely transferring property, our search is for the probable intention of the testator or settlor. In re Trust Co. of Morris County, 83 N.J.Super. 411, 416, 200 A.2d 330 (App.Div.1964). We confine the inquiry to the four corners of the document and the language therein, and then consider the circumstances surrounding its execution and other extrinsic evidence of intention. In re Estate of Payne, 186 N.J. 324, 335, 895 A.2d 428 (2006); Fidelity Union Trust Co. v. Robert, 36 N.J. 561, 564-66, 178 A.2d 185 (1962); In re Trust Under Agreement of Voorhees, 93 N.J.Super. 293, 298-300, 225 A.2d 710 (App.Div.1967). But in this case, as in many such cases, there is no clear signal from Blanche in the language of the 1950 trust or even from extrinsic circumstances whether she intended that a child subsequently adopted by Halsted would share in the class gift made to his "issue," defined only as "lawful issues" under New Jersey law. Accordingly, we will employ presumptions based on the "common impulses of human nature" to interpret the class gift of the trust remainder interest. Fidelity Union, supra, 36 N.J. at 565, 178 A.2d 185.
A bit of history about adoption and the laws of succession or inheritance in New Jersey: originating in Roman and civil law systems, adoption was unknown to English jurisprudence, due no doubt to the English reverence for succession and inheritance through bloodlines reflected by the dubious legal maxim "Solus Deus facit harerden, non homo" ("God alone makes the heir, not the man"). In re Will of Holibaugh, 18 N.J. 229, 233-35, 113 A.2d 654 (1955). See generally, Jan Ellen Rein, The Impact of Adoptions, Adult Adoptions, and Equitable Adoptions on Intestate Succession and Class Gifts, 37 Vand. L.Rev. 711 (1984); George Gleason Bogert & George Taylor Bogert, The Law of Trusts and Trustees § 182 (2d rev. ed.1979). As a result, adoption is of purely statutory origin, and both the right to adopt and the legal consequences of adoption are dependent upon the statute authorizing adoption. Rein, supra, 37 Vand. L.Rev. at 714-18.
Odd as it sounds at this time when child adoptions are commonplace, there was no lawful adoption of a child in New Jersey until 1877. Act of March 9, 1877, ch. 83, 1877 N.J. Laws 123 (repealed 1979). Lawful adoption of an adult came much later in 1925 by separate statute and with different criteria. N.J.S.A. 2:39-1. Act of March 13, 1925, ch. 99, 1925 N.J. Laws 309 (repealed 1979). The governing statutes gave both child and adult adoptees the same rights of inheritance from the adopting parents as their natural or biological children. N.J.S.A. 9:3-30; N.J.S.A. 2:39-1. But the matter of inheritance by an adoptee was more dicey when it came to inheriting from distant or collateral relatives of the adopting parent, particularly when the testator or settlor described a category or class of life or remainder beneficiaries such as "issue," "children," "descendants," and the like, and the adoptee claimed that the testator or settlor intended he or she would be included. State courts were divided on the question. See Jay M. Zitter, Annotation, Adopted Child as Within Class Named in Testamentary Gift, 36 A.L.R.5th 395 (1996); Jay M. Zitter, Annotation, Adopted Child as Within Class Named in Deed or Inter Vivos Trust Instrument, 37 A.L.R.5th 237 (1996). See generally, Halbach, The Rights of Adopted Children Under Class Gifts, 50 Iowa L.Rev. 971 (1965).
When Blanche created her trust in 1950, New Jersey case law reflected the generally *634 accepted rule that, absent a showing of contrary intention, an adoptee was barred from inheriting a gift to a class such as "issue" from a person who was a "stranger to the adoption," i.e., anyone other than the adopting parent. In 1943 our State's highest court affirmed a lower court decision holding that an adopted child of a testatrix's great grandniece born after the testatrix's death was not entitled to share in the trust corpus distributed after the adopting mother's death as a member of the class of "lawful issue." In re Estate of Fisler, 131 N.J. Eq. 310, 25 A.2d 265 (Prerog.Ct.1942), aff'd, 133 N.J. Eq. 421, 30 A.2d 894 (E. & A.1943). As a caveat, it should be noted that In re Estate of McEwan, 128 N.J. Eq. 140, 15 A.2d 340 (Prerog.Ct.1940), a prior lower court decision not cited in either Fisler opinion, had held that an adopted child could take by right of representation a gift to "issue" of property coming from the will of the father of the adopting parent where the testator was fully aware of the adoption.
Nonetheless, in In re Estate of Wehrhane, 23 N.J. 205, 128 A.2d 681 (1957), the Supreme Court majority upheld that portion of Fisler barring an adoptee from taking under a class gift to "issue" or the like under instruments executed by "strangers to the adoption." A lengthy, stinging dissent was issued by Chief Justice Weintraub, and just seven years later the Supreme Court reversed course and reached the opposite result in In re Estate of Coe, 42 N.J. 485, 201 A.2d 571 (1964). In the opinion, written by Chief Justice Weintraub, the majority held that, as a rule of construction, there is a presumption that an adopted child is entitled to take a bequest as a "child" of the adopting parent, even where the testatrix executed the will and died long before the child was adopted. Id. at 492-93, 201 A.2d 571. The Chief Justice gave the following rationale for confining Wehrhane to its facts and changing its reasoning and result:
We cannot believe it probable that strangers to the adoption would differentiate between the natural child and the adopted child of another. Rather we believe it more likely that they accept the relationships established by the parent whether the bond be natural or by adoption and seek to advance those relationships precisely as that parent would. None of us discriminates among children of a relative or friend upon a biological basis. We ought not impute to others instincts contrary to our own. [Id. at 492, 201 A.2d 571 (citations omitted).]
Furthermore, the Chief Justice noted the 1953 amendment to the Adoption Act provided that, subsequent to the effective date of the Act, "an adopted child shall be deemed lawful issue of the adopting parent unless such document shall otherwise provide." Act of July 23, 1953, ch. 264, 1953 N.J. Laws 1768, codified as N.J.S.A. 9:3-30 (repealed 1979). He observed that while the amendment did not apply directly to instruments created prior to its enactment, it reflected the Legislature's understanding of public perception of an adopted child's rights of inheritance from the adopting parent.
In this appeal, Halsted II argues that Blanche's 1950 trust should be interpreted under the rules of construction of trust instruments at the time the trust was created, and since Blanche was a "stranger to the adoption" of Jane by Halsted, the applicable presumption of Fisler and Wehrhane should apply to bar Jane from taking as Halsted's "issue" in the trust. Not surprisingly, Jane argues that the opposite presumption of Coe should be applied retroactively to Blanche's trust. While Coe left the retroactivity question open, "so that the possible equities may be weighed *635 in a specific setting," Coe, supra, 42 N.J. at 495, 201 A.2d 571, the matter was resolved by In re Accounting of Thompson, 53 N.J. 276, 250 A.2d 393 (1969), which held that since the Coe presumption was a rule of construction and not a rule of inheritance, the date for interpreting the will is not the testator's death but the time of the taking by the "issue" of the adopting parent. Id. at 299, 250 A.2d 393. Therefore, it seems clear under Coe and Thompson that an adopted child will equally participate in a remainder class gift to "issue" or the like absent a contrary showing, even though at the time of execution of the instrument, as a rule of construction, the presumption was the opposite.
Yet while Jane is correct that the Coe presumption applies retroactively, this hardly resolves the issue in her favor. For Jane was not adopted as a child but as an adult, and, as she concedes, the rules of inheritance for adult adoptees are different. This distinction between child and adult adoptees was clearly made in Commercial Trust Co. of N.J. v. Adelung, 136 N.J. Eq. 37, 40 A.2d 214 (Ch.Div. 1944), aff'd, 137 N.J. Eq. 541, 45 A.2d 841 (E. & A.1946), in which the stranger to the adoption doctrine was applied to adult adoptees but not to child adoptees. While the 1953 amendments eliminated the doctrine for child adoptees, no such action was taken by the Legislature as to adult adoptees. In In re Estate of Nicol, 152 N.J.Super. 308, 377 A.2d 1201 (App.Div.1977), we held that unlike the situation with the adoption of children, there was no presumption that an adult adoptee was included within a bequest to "issue." In that case, the testatrix's son, after the death of the testatrix, married a woman with four children, who he then raised as his own and later adopted when they were adults. Id. at 310-11, 377 A.2d 1201. Citing Coe and Thompson, the trial judge applied the presumption that the testatrix intended "issue" to include any adoptees, child or adult, of her son. Id. at 311-12, 377 A.2d 1201. We reversed, stating:
The distinction between adopted children and adopted adults is by no means an idle one in the search for the probable intent of a testator. It is one thing to ascribe to a testator a contemplation of the possibility of that which has come to be relatively commonplace, namely, the adoption of a child at some time in the future by a member of the family or other relative, or any other prospective beneficiary under a will. Frequently, in such cases, the child is acquired in infancy, although the child may be older where a spouse adopts a stepchild. In both instances, however, the child is reared as one's own by the adopting parent and is recognized as such among the family and friends.
But it is quite another matter where the adopted person is an adult. It would be difficult to apply to such cases the sensible underlying consideration of Coe and Thompson. One would be hard-pressed to ascribe to a testator, in the absence of any expression thereon or of clarifying attendant circumstances, a probable intent to include an adopted adult among the children or issue of a testamentary beneficiary. It is extremely unlikely that a testator would foresee the likelihood that his or her child, or any other prospective beneficiary, might at some time in the future adopt an adult. It is equally improbable that an adopted adult would be embraced in the bosom of the family members other than the adopting parent, as would an adopted child. We find nothing in the adoption statutes (N.J.S.A. 9:3-17 et seq. (children), N.J.S.A. 2A:22-1 et seq. (adults)) which would support a contrary view. Actually, the fact that at the time of the liberalizing revision of the child adoption *636 law, L. 1953, c. 264, particularly with respect to inheritance, comparable amendments were not made to the adult adoption law, suggests a legislative intent to differentiate between the two types of adoption.
[Id. at 319-20, 377 A.2d 1201.]
In Nicol we cited with approval two county court decisions with holdings to the same effect. Id. at 316-17, 377 A.2d 1201. In In re Estate of Comly, 90 N.J.Super. 498, 218 A.2d 175 (Gloucester Cty. Ct.1966), a thirty-six year old woman with four children was adopted by her half-brother so she could remain in her house after his death. The court held that the adoption was not within the probable intent of the testator's remainder gift to "child" or "children." Id. at 503, 218 A.2d 175. Later in In re Estate of Griswold, 140 N.J.Super. 35, 354 A.2d 717 (Morris Cty. Ct.1976), the life tenant of a trust adopted the adult son of his second wife for him to take under a trust remainder to "children" and thereby avert a default in favor of the life tenant's siblings. There the court specifically relied on the "stranger to the adoption" doctrine to hold that the adult adoptee could not take as issue of deceased children. Id. at 48-60, 354 A.2d 717.
Twenty years after Nicol, the "stranger to the adoption" doctrine was held to be alive and well in New Jersey for adult adoptions. In re Trust For the Benefit of Duke, 305 N.J.Super. 408, 702 A.2d 1008 (Ch.Div.1995), aff'd, 305 N.J.Super. 407, 702 A.2d 1007 (App.Div.1997), certif. denied, 151 N.J. 73, 697 A.2d 546 (1997). Duke involved the Doris Duke trust created by the settlor for his daughter in 1924 with a remainder gift to her "lineal descendants." Id. at 415, 702 A.2d 1008. If she died without any, the trust was to terminate in a gift to the Duke Endowment for the benefit of named charities. Ibid. The trust indenture provided it was to be given effect and construed in accordance with "present existing law and statutes" of New Jersey. Id. at 416-17, 702 A.2d 1008.
Doris Duke died in 1993 at the age of eighty, leaving no natural children. Id. at 415-16, 702 A.2d 1008. But five years earlier she had adopted a thirty-five year old woman who claimed after Doris Duke's death to be the successive life beneficiary under the 1924 trust. Ibid. The court disagreed, holding that the construction of the class gift to "lineal descendants" was governed by the New Jersey law at the time of the trust's creation, which was one year before enactment of the New Jersey statute authorizing adult adoptions, and not the 1993 date of Doris Duke's death. Id. at 435, 702 A.2d 1008.
Therefore, under our case law Jane, as an adult adoptee of Halsted, is subject to the "stranger to the adoption" presumption in the construction of Blanche's 1950 trust indenture thereby excluding her from the remainder class gift to "issue."
Jane asserts that since it is clear that Halsted planned to adopt her when she was a child and would have done so but for the legal impediment presented by his residence in Italy, she should, as a matter of equity, have the same rights of inheritance as if Halsted adopted her as a child. Although not specifically mentioned as such in her brief, Jane's claim to entitlement to the status of Halsted's adoptee during her childhood raises the question as to the applicability of the doctrine of "equitable adoption," sometimes called "adoption by estoppel" or "virtual adoption." Theoretically based in contract or estoppel in pais, equitable adoption is a judicial construct used to uphold claims by a child not formally adopted to benefits from his or her "adoptive parents" in the same *637 manner as the parent's natural or legally adopted children. The doctrine provides a remedy for a child in a promised but unfulfilled adoption by granting specific performance of an express or implied contract to adopt, and by estopping any challenge to the validity of the claimed adoption. It is used to ensure fundamental fairness to a child who would otherwise suffer an injustice. Rein, supra, 37 Vand. L.Rev., at 766-801; Comment, Equitable Adoption: A Necessary Issue?, 35 S. Cal. L.Rev., 491 (1962); Tracy Bateman Farrell, Annotation, Modern Status of Law As to Equitable Adoption or Adoption by Estoppel, 122 A.L.R.5th 205 (2004).
The doctrine has been long recognized in New Jersey. Burdick v. Grimshaw, 113 N.J. Eq. 591, 168 A. 186 (Ch. Div.1933). As stated in Burdick,
It is now firmly established that an oral agreement to adopt, where there has been a full and faithful performance on the part of the adoptive child but which was never consummated by formal adoption proceedings during the life of the adoptive parent, will, upon the death of the latter and when equity and justice so requires, be enforced to the extent of decreeing that such child occupies in equity the status of an adopted child, entitled to the same right of inheritance from so much of his fosterparent's estate that remains undisposed of by will or otherwise, as he would have been had he been a natural born child.
[Id. at 595, 168 A. 186.]
See also Ashman v. Madigan, 40 N.J.Super. 147, 122 A.2d 382 (Ch.Div.1956) (plaintiff entitled to inherit intestate property despite lack of any formal adoption when there was clear and satisfactory proof that an adoption agreement must have existed and clear and convincing evidence of a normal mother-daughter relationship spanning almost fifty years); Hendershot v. Hendershot, 135 N.J. Eq. 232, 37 A.2d 770 (Ch.Div.1944) (foster child entitled to intestate share when testator promised adoption and a share of his estate); Stellmah v. Hunterdon Cooperative G.L.F. Service, Inc., 47 N.J. 163, 219 A.2d 616 (1966) (upholding judgment of adoption entered after death of adopting parent, thereby making the child eligible for worker's compensation benefits); D'Accardi v. Chater, 96 F.3d 97 (4th Cir.1996) (holding adopted child entitled under New Jersey law permitting equitable adoption to receive social security benefits even though the adoption process was not completed before death of adoptive parent); cf. In re Adoption of Baby T, 160 N.J. 332, 734 A.2d 304 (1999) holding that a defendant physician in a malpractice case lacked standing to collaterally attack a judgment of adoption entered posthumously and declining to consider whether or under what circumstances posthumous or equitable adoptions would be recognized, while inviting the Legislature to resolve the matter.
The only New Jersey case disavowing equitable adoption is In re Adoption of a Child by N.E.Y., 267 N.J.Super. 88, 630 A.2d 835 (Ch.Div.1993). There, in a private placement, the prospective adopting mother died before the final adoption hearing and had named the infant in her will as the sole heir to her estate. Id. at 90-91, 630 A.2d 835. The judge denied the guardian's motion to finalize the adoption posthumously in order to receive favorable inheritance tax treatment and enable the infant to receive social security benefits. Id. at 101-02, 630 A.2d 835. The judge stated that New Jersey law did not recognize equitable adoptions, Id. at 95, 630 A.2d 835, a conclusion clearly not supported by our prior case law discussed supra, see D'Accardi, supra, 96 F.3d at 97 n. 1 (criticizing the N.E.Y. court's reasoning).
*638 While equitable adoption provides a judicial remedy for a child, it does not create a legal adoption. Rein, supra, 37 Vand. L.Rev. at 788. As noted, supra, adoption is a legislative creation and not one of common law. As such, the statutory requirements and restrictions are strictly construed. In re Will of Holibaugh, 33 N.J.Super. 232, 235, 109 A.2d 706 (Cty.Ct. 1954), aff'd, 18 N.J. 229, 113 A.2d 654 (1955). Thus assuming the doctrine of equitable adoption was applicable, Jane would have a right to inherit by intestacy from Halsted or share in a class gift in his will. However, it would not give her the status of a legal adoptee, and she would have no right to any interest in Blanche's 1950 trust since she was not Halsted's "lawful issue."
Putting aside the "stranger to the adoption" presumption and that it was unlikely that Blanche envisioned the possibility of an adopted adult qualifying under her class gift to "issue," the undisputed facts are that she treated Jane differently than her natural grandchildren when it came to the disposition of her fortune. She never established a separate trust for Jane as she did with each of the other children. And while the irrevocability of her 1950 trust would have precluded any sort of amendment clarifying the question now at issue, she specifically excluded adoptees from sharing in her 1964 trust and her will. Most telling is that in her will, she did not include Jane among her grandchildren, only referring to her as Halsted's stepdaughter. All these undisputed facts point to the probable intention by Blanche to keep the Billings fortune within bloodlines.
Based on the record before us, and in light of the "stranger to the adoption" presumption, Judge Williams properly concluded that summary judgment should be granted in favor of Halsted II. We conclude that Blanche's probable intention was not to include Jane within the 1950 trust gift to Halsted's "issue." That this result may seem unfair to Jane is tempered by the fact that she appears to have been the primary beneficiary of her parents' bounty. Indeed, the gifts and bequests she received from Halsted and Dorothy in excess of the amounts given to the other children, may have been intended to compensate for her exclusion from Blanche's family fortune.
Affirmed.