989 A.2d 873

IN THE MATTER OF W.R. AND L.R.
FOR THE ADOPTION OF S.W.

Superior Court of New Jersey
Law Division Cumberland County

Decided October 9, 2009.

*Douglas M. Pine,* for Petitioners W.R. and L.R.

MENDEZ, P.J.F.P.

The child, S.W., a boy, was born on February 17, 1996. A married couple, adoptive parents, W.R. (adoptive father) and L.R. (adoptive mother); ages sixty-five and fifty-nine, respectively, received the child into their home on February 10, 2006. Adoptive parents petitioned the court to adopt the thirteen-year-old, S.W., by filing and signing a verified petition for adoption on August 14, 2009. A final adoption hearing was scheduled for September 18, 2009, however on September 16, 2009, just prior to the final adoption hearing, W.R. passed away.

The issue before the court is whether this adoption can be granted nunc pro tunc, effective the date of the filing of the complaint for adoption, when the adoptive parent has died prior to the final adoption hearing. For the reasons expressed in this opinion, this court grants the legal adoption of S.W. to adoptive parents W.R. and L.R. nunc pro tunc effective August 14, 2009, the date the adoption complaint was filed.

*Factual Background*

S.W. came to live with the family as part of a special Division of Youth and Family Services ("DYFS") placement three years ago.

He quickly began calling his foster parents "Mom" and "Dad" and his mother reported that he adjusted well to his new living situation. The relationship between the child and deceased prospective adoptive parent, W.R. was particularly close and parent-like. W.R. taught the child how to play football and basketball and attended all football games and practices. W.R. was also there to help the child with his homework and everyday problems or concerns. The child attended church with W.R. and went shopping for food and other necessities. The child was also taught valuable life skills like carpentry (helping build a garage) and saving money.

W.R. approached the DYFS caseworker to "get the ball rolling" on adopting the child in April of 2008, about a year and a half before the petition for adoption was filed. The caseworker testified at the adoption hearing that W.R. was loving and nurturing and excited about adopting S.W ... L.R. also testified that father always described S.W. as his boy and he told everyone that S.W. is not leaving because we are adopting him. L.R. went on to testify that W.R. was upset with the delay in adopting S.W., but he would tell the child not to worry because he would soon be adopted. Most significantly, W.R. signed the verified complaint for adoption, certifying that it was his intention to adopt S.W. This court also found compelling W.R.'s obituary, which listed S.W. as one of W.R.'s sons. L.R. testified that W.R. would have wanted it that way.

The psychological evaluation, conducted by Dr. Charles E. Daly, documented the need for the child to achieve permanency. The doctor concluded that the child "may very well fall apart if he was moved again; there are just so many moves that his psyche can take." Prior to being placed with adoptive family, S.W. lived in many failed living situations.

DYFS has been involved with S.W. for most of his life because his biological mother abandoned him and left him to live with

family members. According to DYFS records, S.W. has consistently been rejected by his biological family and indicated during his testimony[1] at the final adoption hearing that he wants to belong to a family where he is loved. S.W. has finally achieved stability and a sense of belonging with the adoptive family. S.W. further testified that he is very happy living with prospective adoptive family and he felt like W.R. was his real father.

*Legal Analysis*

Adoption was not recognized at common law and it is a creation of a statute. *N.J.S.A.* 9:3–37. The New Jersey Adoption Act, which governs adoption is liberally construed so that the best interests of the children are promoted and due regard is given to the rights of all persons affected by an adoption. *N.J.S.A.* 9:3–37. More directly, *N.J.S.A.* 9:3–50(b), states that the court may, for good cause, "direct the entry of judgment of adoption nunc pro tunc as of the date the action was instituted." *N.J.S.A.* 9:3–50(b). The statute also gives the adoptive child the same rights of inheritance as a child born in lawful wedlock of the adopting parent. *N.J.S.A.* 9:3–50(b).

■ Petitioners advance two arguments regarding the adoption of S.W.: (1) the theory of equitable adoption and (2) the plain meaning of *N.J.S.A.* 9:3–50(b), which counsel believes authorizes this court to enter a judgment for adoption nunc pro tunc. Although the theory of equitable adoption provides the court with background regarding the complex issues involving the death of a party to an adoption[2], there exists statutory authority, mainly *N.J.S.A.* 9:3–50(b), upon which this court will rely.

---

[1] If the child sought to be adopted is of the age of ten years or over, the appearance of the child shall be required at the final adoption hearing, unless waived by the court for good cause shown, and the child's wishes concerning the adoption shall be solicited by the court and given consideration if the child is of sufficient capacity to form an intelligent preference regarding the adoption. *N.J.S.A.* 9:3–49.

[2] New Jersey recognizes the doctrine of equitable adoption as a theory of inheritance under intestacy. *Burdick v. Grimshaw,* 113 *N.J. Eq.* 591, 596, 168 *A.*

While there are no cases on point regarding the granting of an adoption nunc pro tunc after the death of the adoptive parent, several New Jersey Court decisions, with analogous circumstances, support the conclusions reached by this court. Indeed, courts in this state have recognized that exceptional circumstances sometimes arise that require judicial intervention to achieve a just result. For example, the Supreme Court held that a child, whose prospective adoptive father died prior to the final hearing on adoption, would be considered "legally adopted" for purposes of dependency and entitlement to worker's compensation benefits for the work-related death of his prospective father. *Stellmah v. Hunterdon Coop. G.L.F. Serv. Inc.*, 47 *N.J.* 163, 171–72, 219 *A.*2d 616 (1966). In that case, adoption proceedings were initiated in Quebec after the death of the father and a posthumous judgment of adoption was granted. *Ibid.* The Supreme Court recognized the posthumous judgment. Relevant here, the Court made no mention or criticism about entering the final judgment of adoption when the prospective adoptive parent died prior to the filing of the complaint, the adoption hearing, and the entry of a final judgment.

In 1993, a trial court in Union County denied a final judgment of adoption where the adoptive parent died prior to the final adoption hearing. *In re Adoption of a Child by N.E.Y.*, 267 *N.J.Super.* 88, 102, 630 *A.*2d 835 (Ch.Div.1993). The facts surrounding the adoption in *N.E.Y.* vary significantly from the facts presented to the court here. In *N.E.Y.*, the adoptive parent and the biological parents were friends and entered into a private adoption agreement. The adoptive mother died of cancer, about ten months after the birth of the child and before the final judgment of adoption was entered. In her will the adoptive mother named the infant as the sole beneficiary to her estate and the biological

---

186, 188 (N.J.Ch.1933). Equitable adoption is a device which can be used "to support a claim for benefits which would be available if a legally recognized parent-child relationship existed, such as claims for an intestate share, workers' compensation benefits, social security benefits, and life insurance benefits." *In the Matter of the Adoption of Baby T.*, 311 *N.J.Super.* 408, 416, 709 *A.*2d 1381 (App.Div.1998).

parents as the guardians of the child. Pursuant to the will, the child returned to her biological parents after the death of the adoptive mother and a motion to posthumously grant the adoption was filed so that the child would obtain more favorable inheritance tax treatment and have the opportunity to receive social security benefits. The trial judge denied the motion to grant the judgment of adoption posthumously and made a finding that New Jersey did not recognized the doctrine of equitable adoption, a flawed conclusion clearly not supported by New Jersey case law. The trial court judge also failed to consider and analyze the applicability of *N.J.S.A.* 9:3–50(b) to grant the adoption nunc pro tunc effective the date of filing of the complaint.

Here, in contrast to the facts in *N.E.Y.*, S.W. was brought to this family as a placement by DYFS. Now, for the first time, S.W. is part of an intact family and has consistently lived with his adoptive family since 2008. He has developed a bond where he called his adoptive parents "Mom" and "Dad" and he has no contact with his biological parents. Clearly, S.W. has bonded with his adoptive family. This case is not just about a potential financial benefit to the child, but more importantly, it is about this child belonging to his adopted parents and legally becoming part of the adopted family.

The *N.E.Y.* opinion was criticized by the Fourth Circuit in *D'Accardi v. Chater,* 96 *F.*3d 97 (4th Cir.1996) and the Appellate Division in the case *In re Vander Poel,* 396 *N.J.Super.* 218, 233, 933 *A.*2d 628 (App.Div.2007) for incorrectly finding that New Jersey law did not recognize the doctrine of equitable adoption. In the *Vander Poel* opinion, Judge Collester discussed at length the benefits of equitable adoption, reasoning that "the doctrine provides a remedy for a child in a promised but unfulfilled adoption by granting specific performance of an express or implied contract to adopt, and by estopping any challenge to the validity of the adoption. It is used to ensure fundamental fairness to a child who would otherwise suffer an injustice." *Id.* at 222, 933 *A.*2d 628 (*citations omitted*). The Appellate Division further noted that

adoption is a creation of statute and therefore while equitable adoption creates a remedy for the child it does not create a legal adoption. This court concludes that the doctrine of equitable adoption is indeed an available equitable remedy fully recognized by New Jersey case law; however, in this opinion the court will find that there is statutory authority in this case to grant a legal adoption pursuant to *N.J.S.A.* 9:3–50(b).

Next, the court will analyze the statutory scheme and legislative history of the Adoption Act. The role of the court in any statutory analysis is to determine the intent of the Legislature and give effect to its enactments. *G.S. v. Dept. of Human Servs., Div. of Youth & Family Servs.*, 157 *N.J.* 161, 172, 723 *A.*2d 612 (1999). As such, statutes that deal with the same or very similar subject matter should be read as a "unitary and harmonious whole." *Bd. of Educ. v. Neptune Twp. Educ. Ass'n*, 144 *N.J.* 16, 23, 675 *A.*2d 611 (1996). Another important principle of statutory analysis is "to ascertain the intention of the Legislature from the plain meaning of the statute and to apply it to the facts. [If the statute] is clear and unambiguous, it [is] not open to construction or interpretation...." *In re F.A.U.*, 190 *N.J.Super.* 245, 463 *A.*2d 344 (App.Div.1983).

The Adoption Act has undergone major revisions in the past twenty years. The legislative history reveals that the revisions were intended "to simplify and clarify the provisions governing adoption proceedings" to promote adoptions. *See* statement to Senate Judiciary Committee, accompanying *S.* 1631, 197th Leg., 1st Sess. (N.J. 1976). In 1977, the Legislature included a broad statement that the Act should be liberally construed to promote the best interests of the adoptive children involved and that "due regard shall be given to the rights of all persons affected by an adoption." *L.* 1977, *c.* 367 § 1 (repealed 1993 and recodified as amended at *L.* 1999, *c.* 53, § 1). As such, when the court is considering an adoption "[t]he best interests and welfare of the child should be the paramount consideration of the court ..." *In*

*re Adoption of G.,* 89 *N.J.Super.* 276, 281, 214 *A.*2d 549 (Cty.Ct. 1965).

To determine the scope of *N.J.S.A.* 9:3–50(b), which states that the court may, for good cause, direct the entry of a final judgment of adoption nunc pro tunc as of the date the petition for adoption was instituted, this court will consider the legislative history of the Adoption Act and the relevant case law previously discussed in this opinion, which liberally applies the Adoption Act in consideration of the best interests of the child.

A statute, such as this, which allows for an adoption nunc pro tunc, provides the trial judge with a tool to ensure that the best interests of the child are served by the imposition of a just result. The plain reading of the statute permits this court to grant an adoption going back to the date of filing. The date of filing is important because it will permit the court to grant the adoption even after the death of a prospective adoptive parent and may provide the child with the opportunity to enjoy certain benefits from the deceased parent. For example, the child may be eligible for social security survivor benefits, life insurance benefits, veteran's benefits, immigration status, medical insurance and other benefits that arise from the death of a parent. This court finds that based on the legislative history and the plain meaning of the statute the Legislature intended to provide the trial court with the authority to grant a legal adoption pursuant to *N.J.S.A.* 9:3–50(b) nunc pro tunc effective the date of filing of the adoption complaint.

 This court now turns to what constitutes good cause [3] under *N.J.S.A.* 9:3–50(b). Courts in this state have not defined good cause in the context of entering a judgment nunc pro tunc. However, this court is of the opinion that before granting an adoption nunc pro tunc, after the death of an adopted parent, sufficient evidence must be presented to support a finding that: (1) there was an agreement to adopt, (2) the nature of the

---

[3] A legally significant reason. *Black's Law Dictionary* 183 (8th ed. 2004).

relationship was that of a parent-child, (3) the intent of the deceased parent was to adopt, and (4) granting the adoption is in the best interests of the child.

■ In this case the evidence presented is sufficient as to each of the prongs. First, the most telling piece of evidence is that the prospective adoptive parents in this case filed with the court a verified complaint for adoption, signed and certified by both parents. The document was filed with the court prior to the unexpected death of W.R. Also important are the actions of the deceased. The prospective adoptive father initiated the call to the DYFS caseworker requesting an adoption nearly two years ago, in April of 2008, and the parents were awaiting the final hearing when W.R. unexpectedly died. Prior to his death, W.R. openly and publicly expressed his commitment to adopt S.W., even to the point of asking his sister to be the child's godmother. This court finds that all of this evidence supports the finding that there was an agreement to adopt the child.

■ As to the second prong, the testimony and evidence in this case makes it readily apparent that there existed a child-parent relationship between the child and the prospective adoptive parents. The child came to live with the family as part of a special DYFS placement three years ago. He quickly began calling his foster parents "Mom" and "Dad" and L.R. reported that he adjusted well. The relationship between the child and deceased prospective adoptive parent, W.R. was particularly close and parent-like. W.R. taught the child how to play football and basketball and attended all football games and practices. W.R. was also there to help the child with his homework and everyday problems or concerns. S.W. attended church with W.R. and went shopping for food and other necessities. S.W. was also taught valuable life skills like carpentry (helping build a garage) and saving money. This court concludes that there was undeniably a parent-child bond between the W.R. and S.W.

■ Third, sufficient evidence supports the court's finding that there is no doubt that W.R. intended to adopt S.W. W.R. approached the DYFS caseworker to "get the ball rolling" on adopting the child nearly two years before the complaint for adoption was filed. The caseworker described adoptive father as loving and nurturing and excited about adopting the child. L.R. said that W.R. always described S.W. as his boy and he told everyone that S.W. is not leaving because we're adopting him. L.R. also reported that W.R. was upset with the delay in adopting S.W., but he would tell the child not to worry because he would soon be adopted. Most notably, W.R. signed the verified complaint for adoption, certifying that it was his intention to adopt S.W. Most telling, when W.R. died, the child was listed as one of his sons in the obituary because W.R. would have wanted it that way. The court finds that W.R. undoubtedly intended to adopt the child at the time of his unexpected death.

■ Fourth, the best interests of S.W. will undoubtedly be served by allowing the judgment of adoption to be entered nunc pro tunc. This court accepts the findings of the psychological report which documents the need for S.W. to achieve permanency and agrees that harm will result to S.W. if he does not achieve permanency as provided by prospective adoptive parents. S.W. has consistently been rejected by his biological family and testified that he wants to belong to a family where he is loved. With the prospective adoptive family, the child has stability and a sense of belonging for the first time. S.W. testified that he is very happy and he felt like W.R. was his real father. Without question, this court finds that the best interests of S.W. will be served by allowing the adoption of the child by both parents, W.R. and L.R.

For all the reasons stated in this opinion, this court will enter a final judgment of adoption nunc pro tunc granting legal adoption of the child, S.W., to prospective adoptive parents W.R. and L.R. effective the date of the filing of the adoption complaint.